494 So.2d 669 (1985)
Judith Ann NEELLEY
v.
STATE.
7 Div. 145.
Court of Criminal Appeals of Alabama.
March 12, 1985.
Rehearing Denied May 14, 1985.
*670 Robert B. French, Jr., Fort Payne, for appellant.
Charles A. Graddick, Atty. Gen., and Rivard Melson and William D. Little, Asst. Attys. Gen., for appellee.
BOWEN, Presiding Judge.
On the night of September 25, 1982, thirteen-year-old Lisa Ann Millican was taken from the Riverbend Mall in Rome, Georgia. After being brutalized and sexually *671 abused, she was taken to the rim of the Little River Canyon in DeKalb County, Alabama, on September 28th. There, using a needle and syringe, Judith Ann Neelley injected the child with six shots of caustic drain cleaner. When these injections failed to kill the teenager, Mrs. Neelley shot her in the back with a pistol and pushed her body into the canyon.
Mrs. Neelley was indicted for the capital offense of murder during a kidnapping in violation of Alabama Code 1975, § 13A-5-40(a)(1). A jury found her "guilty of the capital offense charged in the indictment" and recommended that she "be punished by life imprisonment without parole." The vote was ten jurors for life without parole and two for death. After another sentencing hearing, the trial judge rejected the jury's recommendation and sentenced Mrs. Neelley to death by electrocution.

I
The major issue presented by this appeal is whether the failure to inform Mrs. Neelley that an attorney was at the jail waiting to see her while she was being questioned by law enforcement officers violated her right to counsel and vitiated her waiver of her Miranda rights rendering her statements inadmissible for use by the prosecution in its case-in-chief.
Mrs. Neelley made two statements, one in Tennessee and the second in Alabama. Evidence on the voluntariness of these statements was presented both at trial during the voluntariness hearing and at the hearing on the motion for new trial.
On September 28, 1982, Mrs. Neelley killed Lisa Ann Millican in DeKalb County, Alabama. On October 10th, she was arrested in Murfreesboro, Tennessee, on unrelated charges involving forged checks or money orders at a Murfreesboro bank.
Two days later, on October 12th, Alvin Neelley, the defendant's husband, retained Murfreesboro attorney Bill Burton to represent Mrs. Neelley on the forged money orders. Although Burton had never dealt with Mrs. Neelley, he had been the "family attorney" for a number of years, having represented Mrs. Neelley's father, mother, sister, grandfather, and uncle.
That same day, Burton interviewed Mrs. Neelley at the Rutherford County (Tennessee) Jail. Either later that day or the next, he represented her at a preliminary hearing on the forged money orders. After this hearing and before the 14th of October, Burton had at least two conversations with Mrs. Neelley at the county jail.
On October 13th, Alvin Neelley was arrested on charges involving forged money orders and was incarcerated in the Rutherford County Jail.
From 5:50 until 11:20 on the night of October 14th, Mrs. Neelley was interviewed by Special Agent Bill Burns of the Federal Bureau of Investigation. All the State's evidence proved that Mrs. Neelley never requested counsel. However, Mrs. Neelley testified that when the interview first started she told Agent Burns that she would like to speak to her lawyer before she answered any questions. She stated that when Burns told her that "it was just a few routine questions about [her] background", she replied that since all he wanted was some background information she would answer without a lawyer present. Although she agreed to talk without her lawyer present, Mrs. Neelley refused to sign a waiver of rights form.
Agent Burns testified that he had already obtained an oral waiver and had begun to take Mrs. Neelley's statement before he learned she had an attorney. He stated that Mrs. Neelley told him that Burton was her attorney and that she initially refused to talk about the money orders without her attorney being present: "She stated that Bill Burton was her attorney and that the reason she did not want to discuss this issue [money orders] was because some people would think that a person who traveled around without having a steady job was not a good person." Mrs. Neelley agreed to talk "about any other matter." Later in the interview, Mrs. Neelley did volunteer information about the money orders.
*672 During the interview of October 14th, Agent Burns advised Mrs. Neelley on five separate occasions that "if she did not want to be interviewed any further that the interview could be terminated and that she could be returned to her jail cell at the sheriff's jail and that she did not have to talk with us any further if she didn't want to." The opportunity to terminate the interview was given at 6:25, 6:49, 7:32, 8:10, and 11:05. Burns stated that "[o]n each occasion she insisted that she did want to continue talking with us."
Mrs. Neelley testified that she declined to stop talking when given the opportunity because she "wanted to find out exactly what they were there for": "I told them that before I went back I'd like to find out a few more details about what they were wanting to know. * * * I just wanted to find out exactly what they were there for. They were mostly beating around the bush." She told Agent Burns that she wished he would stop asking her if she wanted to stop talking.
At some point in this interview with Mrs. Neelley, after the waiver of the Miranda rights had been obtained, Agent Burns was informed that Attorney Burton was present and wanted to talk to his client. Burton was not allowed to see Mrs. Neelley and Mrs. Neelley was never told that Burton was in the hallway wanting to see her.
Attorney Burton testified that, between 6:30 and 7:00 on the evening of October 14th, Alvin Neelley called him and asked him to come to the jail because "there were officers from out of state that wanted to talk to them." Burton immediately went to the jail and learned that federal and Georgia law enforcement officers were interviewing both Mr. and Mrs. Neelley.
Alvin Neelley requested an attorney, and Burton was allowed to visit him. However, Burton was not allowed to see Mrs. Neelley, who was being interviewed by two agents of the Federal Bureau of Investigation. After Burton appeared, an F.B.I. agent contacted a United States Attorney and, on his advice, told Burton that he would not be allowed to see Mrs. Neelley unless she specifically requested an attorney.
Investigator Danny Smith of the District Attorney's Office in DeKalb County, Alabama, refused to allow Burton to see Mrs. Neelley "somewhere around seven o'clock." Smith testified:
"As I recollect, Mr. Burton came out of the interview room where Alvin Neelley was being interviewed and asked if we were interviewing Judy Neelley, and I told him that we were. He wanted to know where she was being interviewed at, and I think I indicated the room that she was in, and he advised me that he was an attorney, that he had been retained to represent her regarding some forgeries or some checks there in Rutherford County, and I advised him that we were not talking with her about forgeries; that we were investigating a homicide, and I refused him admittance to the room."
When Burton attempted to see Mrs. Neelley, he was not aware of any murder investigation and "was not aware of anything in Georgia or Alabama prior to that night." He testified that he "knew nothing of Lisa Ann Millican [the victim] and never saw" Mrs. Neelley after he became aware of that case. Burton stated that "the general purpose for going to the jail, [was] to advise her not to talk to the detectives." When Burton was denied access to Mrs. Neelley, he "didn't create a scene to get back to her, but it was obviously the intent of the officers to prevent ... [him] from getting back to her." He testified that he told one officer that "you may mess up your case or you may mess up your evidence if you don't let me see her."
At the hearing on the motion for new trial, Mrs. Neelley's uncle, Donald Adams, testified that when Burton was not allowed to see Mrs. Neelley "[t]he words got a little heated almost to the point of an argument, and Bill Burton kept expressing his desire to be in the room with his client while she was being questioned and was refused."
*673 Immediately after the interview with Agent Burns, Mrs. Neelley waived extradition from Tennessee and was transferred to Fort Payne, Alabama, on October 15th. She was charged with murder in a complaint filed in DeKalb County on October 15, 1982, and arrested at 2:18 that morning. Mrs. Neelley gave her second statement at approximately 1:00 or 2:00 on the afternoon of October 15th in the courthouse at Fort Payne. This statement was made to De-Kalb County District Attorney's Investigator Danny Smith. At 3:00 that afternoon, Mrs. Neelley was brought before a circuit judge, the charge was explained, and counsel was appointed. The indictment was returned on October 27, 1982.
In his oral order following the voluntariness hearing (see Appendix I) held during the trial and in his written order denying the motion for new trial (see Appendix II), the trial judge found that Mrs. Neelley was properly advised of her Miranda rights and that she made voluntary and understanding waivers of those rights, including the right to have counsel present.
The trial judge found that the refusal to admit Attorney Burton was not an interference with the attorney-client relationship with regard to the homicide cases. In his oral order made during the trial, the judge stated:
"Number 6, the Court finds that Attorney Bill Burton did not represent the defendant in connection with the criminal offense being investigated by Special Agent Burns and the other officers conducting the interview and that the defendant did not request to have an attorney present during the interview; therefore, the Court finds that the refusal to admit Attorney Burton to the interview room was not an interference with the attorney/client relationship. To the extent, however, that the defendant's statement made on that occasion contains anything about the offense with which she was charged in Murfreesboro, Tennessee, that portion of the statement is inadmissible, because, clearly, Mr. Burton was representing her with regard to those charges." (Emphasis added). Appendix I, p. I-2.
In his written order denying the motion for new trial, the judge made similar findings except that he made no reference to any part of the statement being excluded:
"e. Attorney Bill Burton did not represent the defendant in connection with the murder of Lisa Millican, the offense about which the defendant was being interviewed, and the refusal to admit him into the interview room was not an interference with the attorney-client relationship." Appendix II, p. II-3.
The determination of the admissibility of Mrs. Neelley's confessions initially involves the resolution of two issues: (1) Did the refusal to allow attorney Burton to see Mrs. Neelley violate Mrs. Neelley's Sixth Amendment right to the effective assistance of counsel? (2) Did the failure to inform Mrs. Neelley that Attorney Burton was present and had requested to see her preclude a knowing and intelligent waiver of her Fifth Amendment right against self-incrimination and right to counsel?
To each question there exists authority supporting both the preservation and the violation of Mrs. Neelley's Sixth Amendment right to counsel.
In Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), the accused not only requested counsel, but his counsel was prevented from seeing him after the attorney arrived at the police station. In Miranda v. Arizona, 384 U.S. 436, n. 35, 86 S.Ct. 1602, n. 35, 16 L.Ed.2d 694 n. 35 (1966), the United States Supreme Court commented on the deprivation in Escobedo.
"The police also prevented the attorney from consulting with his client. Independent of any other constitutional proscription, this action constitutes a violation of the Sixth Amendment right to the assistance of counsel and excludes any statement obtained in its wake." (Emphasis added).
Confusion exists over the actual meaning of the dicta contained in this footnote. It has been argued that the footnote means *674 literally what it says. See Rothblatt and Pitler, Police Interrogation: Warnings And WaiversWhere Do We Go From Here?, 42 Notre Dame Law. 479, 494-95 (1967). However, Professor Kamisar argues that "to read the language in the Court's footnote 35 as granting the lawyer retained by friends or relatives (not by the suspect himself) an absolute, automatic right to see his `client' who has not asked for a lawyer and is unaware that he even has one is to prevent such suspects from waiving their rights in the absence of counsel and is, in effect, to say that the `realities' of police station proceedings are such that the Miranda warnings alone do not provide adequate protection if issued by police officers." Rothblatt, supra. See also Kamisar, Brewer v. Williams, Massiah And Miranda: What Is "Interrogation"? When Does It Matter?, 67 Geo.L.J. 1, n. 537 (1978).
Of the state supreme courts and the one federal circuit court which have considered the issue, all have held "that the failure to inform a suspect in custody that his attorney or an attorney retained for him was seeking to see him vitiated his waiver of his Fifth Amendment right to assistance of counsel at his questioning." Burbine v. Moran, 753 F.2d 178 (1st Cir.1985).
Here, this Court need not decide whether Mrs. Neelley's constitutional rights were violated because of our overwhelming conviction that the error, if any, was harmless.

II

HARMLESS ERROR
Even if Mrs. Neelley's confessions were inadmissible because of a violation of her Fifth or Sixth Amendment right to counsel, any error in the admission of those confessions were cured by her own testimony at trial.
Although we are extremely reluctant to apply the doctrine of harmless error in a capital case, the facts before us are as unique as they are bizarre and not only invite but demand a finding of harmless error.
"[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). It must appear "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained," id. at 24, 87 S.Ct. at 828, because if "there is a reasonable possibility that the evidence complained of might have contributed to the conviction," id. at 23, 87 S.Ct. at 827 (quoting Fahy v. Connecticut, 375 U.S. 85, 86-87, 84 S.Ct. 229, 230-231, 11 L.Ed.2d 171 (1963)), then the error must be considered harmful.
Although the principles of harmless error do not apply to coerced confessions, Lynumn v. Illinois, 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963), they do pertain to voluntary, albeit "illegally obtained" statements, i.e., those whose illegality follows from a failure to give adequate Miranda warnings or from other improper police procedures, see, e.g. Milton v. Wainwright, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972). "The two standards employed by the courts to determine whether a trial error is harmless are the `overwhelming evidence' test and the `harmless beyond a reasonable doubt' test." Note: State v. Bonuchi: The Harmless Error Rule Applied To Miranda Exclusions, 27 St. Louis U.L.J. 727, 728 (1983):
"Under the `overwhelming evidence' standard, the court on appeal will reverse the conviction only if the constitutionally admissible evidence does not provide an overwhelming indication of the defendant's guilt. Under the `harmless beyond a reasonable doubt' test, however, the conviction will be reversed if the tainted evidence could have reasonably contributed to the verdict." Id., at 728
In the present case, we find harmless error under both types of judicial scrutinythe existence of overwhelming other evidence of Judith Ann Neelley's guilt and the fact that her statements could not reasonably *675 be found to have contributed to the verdict.
At trial, before any confession had even been mentioned, the prosecution had entangled Mrs. Neelley in an intricate web of circumstantial evidence linking her to the murder.
Lisa Millican was last seen at the Riverbend Mall in Rome, Georgia, at approximately 7:00 on the night of Saturday, September 25, 1982. Mrs. Neelley and her husband were at that mall around 5:00 that same evening. The State established that on the following Tuesday Mrs. Neelley telephoned the Rome, Georgia, police department and told them that Lisa's body could be found "where she left it." That Wednesday, when the body had still not been discovered, Mrs. Neelley telephoned the DeKalb County Sheriff's Office and gave the same information.
On October 3, 1982, Mrs. Neelley tried unsuccessfully to pick up Diane Bobo in another shopping center in Rome, Georgia. Later that same day, Mrs. Neelley succeeded in getting John Hancock and Janice Morrow Chapman to ride around with her and Alvin. Hancock testified that Mrs. Neelley pulled a pistol, marched him into the woods and that Alvin "holler[ed] down and [told] her to hurry up and get it over with, that [they] had to go." Hancock stated that Mrs. Neelley responded, "Okay, just a minute," told him not to worry about his girlfriend, "that she would take care of her too," and shot him in the back. Miss Chapman was never seen again.
On October 4, 1982, Mrs. Neelley attempted to pick up Deborah Smith, using the same method or approach she had used with other girls.
Physical evidence also linked Mrs. Neelley to Miss Millican's murder. Expert testimony revealed that one head hair "microscopically similar" to Mrs. Neelley's head hair was found on the shirt Lisa Millican was wearing when her body was discovered. A hair "microscopically similar" to Mrs. Neelley's was also found on a towel found at the scene. Human seminal fluid consistent with Alvin's blood type was found within the body of Miss Millican.
Even though circumstantial, this evidence was sufficiently "overwhelming" to permit application of the harmless error rule.
Second, we conclude that Mrs. Neelley's confessions did not reasonably contribute to the verdict and must be deemed harmless for this reason. As became apparent early in the trial, the defense strategy in this case was not to deny the fact that Mrs. Neelley committed the actual kidnapping and murder of Lisa Ann Millican. All the acts in the sequence of events culminating with the victim's brutal murder were admitted by the defense. The only triable issue became the defendant's mental state, or legal culpability for these acts. The theory of the defense hinged on the idea that Mrs. Neelley was not responsible for her acts by reason of a mental disease or defect induced by the abuse she endured at the hands of her husband. In this regard we find the case before us strikingly similar to Hall v. United States, 410 F.2d 653 (4th Cir.), cert. denied, 396 U.S. 970, 90 S.Ct. 455, 24 L.Ed.2d 436 (1969).
The defendant in Hall never denied the kidnapping with which he had been charged; insanity was his sole defense. In spite of the fact that under federal law a defendant's statements to a psychiatrist are insulated from use during the guilt phase of a criminal trial, see 18 U.S.C. § 4244 (1982), the government introduced inculpatory admissions made to defendant's psychiatrist. Against the contention that he should have received a new trial because of the erroneous admission of these statements, the Fourth Circuit Court of Appeals held that the error was harmless, commenting that, "It was deliberate defense strategy to admit the elements of the offense and deny mental responsibility." 410 F.2d at 661 (emphasis added).
This Court would be blind to overlook the same deliberate defense strategy employed here. While we cannot fault the defense for attempting to turn the admission of Judith Neelley's confession to its advantage, *676 we must recognize the trial tactic used here, namely: Mrs. Neelley's attempt to exonerate her husband's part in the atrocious crime was but another manifestation of her having been "programmed" by him to do his bidding, to carry out his criminal deeds, and then to shield him from liability. Under the circumstances, it would be unrealistic to find that disclosing the confession to the jury served to prejudice Mrs. Neelley. See also Meador v. United States, 341 F.2d 381 (9th Cir.1965) (because defense counsel admitted in his opening statement that the only defense was insanity, defendant could not have been prejudiced by the admission of a co-defendant's statement implicating defendant in the commission of the crime); State v. Gatcomb, 389 A.2d 22, 27 (Me.1978) ("The record leaves no doubt that defense counsel had no realistic hope of an acquittal on the merits but was concerned primarily with establishing the truth of the plea of not guilty by reason of mental disease or defect. * * * It is thus apparent to us that it was trial strategy not to make any effort to deny the act of cutting the victim across the throat with broken glass, but to seek a finding of lack of responsibility therefore because of mental disease or defect. Such being the trial strategy, it was obviously harmless error (if error at all) to admit the testimony of Dr. Cloutier."); People v. Congilaro, 60 A.D.2d 442, 400 N.Y.S.2d 409, 415 (N.Y.App.Div.1977) ("Inasmuch as defendant never placed in dispute ... the [criminal] acts but rather the sole question for the jury concerned his mental state at that time, there is no reasonable possibility that the Court's error might have contributed to defendant's conviction and such error is thus harmless beyond a reasonable doubt."); State v. Barbour, 43 N.C.App. 38, 258 S.E.2d 72, 74 (1979), cert. denied, 299 N.C. 122, 261 S.E.2d 924 (1980) ("Defendant does not contend that he did not shoot Abner. There is no reasonable possibility, therefore, that the statement contributed to his conviction.").
It has never been disputed that Judith Ann Neelley killed Lisa Millican. In his opening statement to the jury at the beginning of the trial, before the hearing on the admissibility of the confessions had been held, and before any reference to Mrs. Neelley's statements had been made before the jury, defense counsel argued that Mrs. Neelley had killed Lisa at the direction of and under the control of Alvin Neelley, but that she "never had the intent to kill anyone."
In his opening statement, defense counsel informed the jury of Mrs. Neelley's deprived childhood, of her mother's and her sister's promiscuity, and of how, at fifteen years of age, she ran away from home and married Alvin Neelley, a twenty-six-year-old "ex-con" who stole her virginity and later her mind. Defense counsel told a story of how Mrs. Neelley was physically beaten and sexually abused; a story of how she was "brainwashed", and reduced to a "vegetable" and an instrument and extension of her husband.
In his opening statement, defense counsel told the jury that Mrs. Neelley had been trained to do everything she could to try to keep Alvin satisfied and to avoid his beatings. Counsel related facts which involved Mrs. Neelley in robbery, firebombing, forgery, conspiracy to commit murder, and other crimes. Counsel told of how Alvin forced her to procure young girls with "small sex organs" for him.
Defense counsel admitted that Mrs. Neelley had "lured or captured or cajoled" thirteen year old Lisa Ann Millican to come with her after Alvin had pointed out Lisa as the one he wanted. He told of how Mrs. Neelley had "convinced" and "persuaded" the child to have sex with Alvin and of how Alvin had sexually abused Lisa. Finally, defense counsel related how Mrs. Neelley, under Alvin's direction and control, injected Lisa with Drano and Liquid Plumber, shot her in the back with a pistol, and pushed her body into Little River Canyon.
Although the District Attorney had made no mention of any confession or statement in his opening remarks, defense counsel told the jury that "when they arrested Judy she spent all of her time exonerating *677 Alvin saying he had nothing to do with any of it, that he's just innocent." Counsel stated that "when the evidence is in the State will prove its case, and we will prove that Judy Neelley lackedalthough we don't have to prove itwe will prove that Judy Neelley never had the intent to kill anyone."
Mrs. Neelley's defense was a combination of duress, Alabama Code 1975, § 13A-3-30, the battered woman syndrome, Annot., 18 A.L.R.4th 1153 (1982), and coercive persuasion, Delgado, Ascription of Criminal States of Mind: Toward A Defense Theory For The Coercively Persuaded ("Brainwashed") Defendant, 63 Minn.L. Rev. 1 (1978); Dressler, Professor Delgado's "Brainwashing" Defense: Courting A Determinist Legal System, 63 Minn.L. Rev. 335 (1979); Delgado, A Response To Professor Dressler, 63 Minn.L.Rev. 361 (1979). See also United States v. Hearst, 412 F.Supp. 863 (N.D.Cal.1975); United States v. Hearst, 424 F.Supp. 307 (N.D.Cal. 1976), affirmed, 563 F.2d 1331 (9th Cir. 1977), cert. denied, 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978); People v. Manson, 61 Cal.App.3d 102, 132 Cal.Rptr. 265 (1976), cert. denied, Manson v. California, 430 U.S. 986, 97 S.Ct. 1686, 52 L.Ed.2d 382 (1977).
The defense was that Alvin had subjected Mrs. Neelley to such violent and gross mental, emotional, physical, and sexual abuse that she would have done anything, and did do everything he asked. A picture was painted, in the terminology used at trial, of Alvin as "Frankenstein" and Mrs. Neelley as "The Bride of Frankenstein." The jury was exposed to accounts of "putrid, pornographic, degrading, disgusting sex" as Mrs. Neelley testified how she had been dominated, manipulated, and trained like an animal. She described herself as feeling like "a piece of meat" and it was argued that she had been reduced to a "nonhuman".
The trial judge was very liberal in allowing the defense to present its case to the point where finally the District Attorney protested that "the Court has been almost to the state of disbelief in being lenient." Even though Alvin Neelley did not testify, time and time again the defense was permitted to prove what he had said. Only by showing that Mrs. Neelley was an animal, a puppet, acting without intent or thought, could the defense hope to sustain its theory of coercion and duress.
Much of the damaging testimony incriminating Mrs. Neelley was adduced by defense counsel in his cross examination of Agent Burns and Investigator Smith about what Alvin had told them about Mrs. Neelley. Although the prosecutor had only concentrated on the major portions of Mrs. Neelley's statements, defense counsel interrogated Burns and Smith about facts and details not mentioned by the State. Counsel repeatedly inquired about the forged money orders, although the trial judge had previously ruled that those particular portions of the statements were inadmissible. The defense elicited testimony from Burns and Smith that Alvin had corroborated Mrs. Neelley's statements that he had nothing to do with the murders. Indeed, it was defense counsel who directed Investigator Smith to tell the jury "in detail" what Alvin had said that Mrs. Neelley did to Miss Chapman and Miss Millican "sexually" and that Alvin had told Investigator Smith that Mrs. Neelley "enjoyed performing oral sex with a female after he had sexual intercourse with them."
It was defense counsel's cross examination of Agent Burns which elicited, over the State's objection, Alvin's statement that "Lisa Ann Millican came into him and told him that she wanted to have sex with him, and the reason for that was because Lisa Ann Millican was afraid of Judith Neelley and that Judith Neelley had told her that if she didn't have sex with Alvin Neelley that she would turn her back over to the state authorities." It was during defense counsel's direct examination of Mrs. Neelley when she admitted that the very first sexual partner she had procured for her husband had been her own sister.
From the opening statement of defense counsel until his closing argument to the *678 jury, Mrs. Neelley maintained that by her confessions she was attempting to exonerate Alvin Neelley of any criminal activity. In her confessions, she took "full responsibility for the culpability" of the murders and never implicated Alvin in the "direct acts". A significant portion of her defense was devoted to showing that in confessing she was just doing what Alvin Neelley had told her to do. At trial, Mrs. Neelley testified that she killed Lisa Millican and Janice Chapman, and that she attempted to kill John Hancock. However, she maintained that she was acting under the control and at the direction of Alvin Neelley. She testified that the purpose of giving a statement to the F.B.I. was "[s]o Al wouldn't get in trouble."
At trial, Mrs. Neelley testified that she was just doing as she had been told and that Alvin had coerced her into performing every criminal act she committed. As part of her defense, she introduced into evidence a letter she had written to Alvin on October 15, 1982after she had given both statements and after counsel had been appointed. She wrote the letter "expecting" that someone would read it and gave it to her trial counsel to deliver to Alvin. The letter was admitted over the State's objection and despite the trial judge's earlier ruling during the hearing on the voluntariness of the confession that it could not be presented to the jury.
In the letter, Mrs. Neelley claimed full responsibility for the death of Lisa Millican: "I told them that you didn't have anything to do with the shooting though, and I have proof. * * * But they're trying to hang the murder of Lisa on you too, and you weren't even aware that I had her." Mrs. Neelley testified that she wrote the letter to clear her husband even though it was not true: "I said that he was nowhere around when I did those things and I said he didn't know anything about it, and he was there. He had told me to do it." This letter was placed before the jury by the defense. Its significance lies in the fact that it discloses just how important and vital a role Mrs. Neelley's own confessions played in establishing her defense.
In her four days of direct examination, Mrs. Neelley admitted virtually every fact contained in her confessions. She testified that she deliberately misled the law enforcement officers to believe that Alvin had nothing to do with the crimes she had committed. She stated that she originally told her trial attorneys the same story she told Agent Burns and Investigator Smith.
In her trial testimony, Mrs. Neelley not only admitted the facts of her confessions, but she volunteered additional information about her criminal activities with Alvin which included attempted murder, burglary, forgery, arson, theft, child abuse, incest, rape, and sexual sadism. Most significantly, Mrs. Neelley deliberately injected into the trial the countless forgeries and offenses involving the money orders, even though the trial judge had previously ruled those portions of her confessions inadmissible. Mrs. Neelley admitted that she killed Lisa Ann Millican and testified that she would have killed others if Alvin had told her to.
The very substance, detail, and quantity of Mrs. Neelley's own testimony is so forceful that, even on the cold pages of the appellate record, it appears to a certainty that her testimony virtually annulled and annihilated any prejudicial effect the admission of her confessions could have had. That testimony redefines and gives new meaning to traditional concepts of depravity and evil.
In light of the overwhelming evidence against Mrs. Neelley, in view of the fact that her confession illuminated no disputed issue in the case, and considering her own admission at trial, we cannot avoid the conclusion that the admission of Mrs. Neelley's confessions, if error, was harmless. While we recognize that a harmless error analysis has often been applied to claimed evidentiary error in capital murder cases, see, e.g., Coulter v. State, 438 So.2d 336, 343 (Ala.Cr.App.1982), affirmed, Ex parte Coulter, 438 So.2d 352 (Ala.1983), we, like the Fifth Circuit Court of Appeals,

*679 "are highly aware of the threat to our cherished constitutional rights posed by the misapplication or creeping extension of the harmless error rule in any of its various mutations. We do not now nor do we intend to broaden the limited reach of this rule. Our review of the record, however, leaves us with no reasonable doubt that the tainted evidence did not contribute to petitioner's conviction and that the jury at petitioner's 1965 trial would have reached the same verdict without hearing the constitutionally defective testimony."
Smith v. Estelle, 519 F.2d 1267, 1271 (5th Cir.1975), on rehearing, 527 F.2d 430 (5th Cir.1976).
In Smith v. Estelle, supra, the federal court initially determined that the admission of the defendant's confession, although error, was harmless because of the overwhelming evidence, including his own trial testimony, against him. 519 F.2d 1267. On rehearing, however, the court was persuaded that part of its harmless error analysis might have been incorrect because, like the defendant in Harrison v. United States, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968), the accused in Smith v. Estelle may have been impelled to testify in order to overcome the effect of his earlier admitted confession. The Fifth Circuit Court of Appeals noted the following on rehearing:
""The same principle that prohibits the use of confessions [unlawfully] procured also prohibits the use of ... the fruit of the poisonous tree, to invoke a time-worn metaphor. * * * If he [took the stand] in order to overcome the impact of confessions illegally obtained and hence improperly introduced, then his testimony was tainted by the same illegality that rendered the confessions themselves inadmissible.' Harrison v. United States, 1968, 392 U.S. 219, 222-23 [88 S.Ct. 2008, 2010, 20 L.Ed.2d 1047].... If Smith would not have taken the stand but for the admission of his unlawful pre-trial confession ... then his trial testimony was tainted thereby and cannot be considered as independent evidence of guilt for purposes of applying the harmless error rule." Smith v. Estelle, 527 F.2d at 433.
In our judgment, the Smith v. Estelle and Harrison v. United States rationales for not finding harmless error are not present in the case before us. As one commentator has observed, "Nevertheless, if Harrison had, for other reasons, already decided to testify, the admission of his confessions would have had no actual coercive effect." The crucial issue in Harrison is thus the defendant's motivation for taking the stand; in the words of [the Supreme] Court, "`[t]he question is not whether the petitioner made a knowing decision to testify, but why.'" Note, 82 Harv.L.Rev. 220, 223 (1968) (quoting Harrison v. United States, 392 U.S. at 223, 88 S.Ct. at 2010, 20 L.Ed.2d 1047.)
The record before us unequivocally illustrates that Mrs. Neelley's decision to take the stand was a defense strategy unrelated to the admission of her confession. The very nature of her defense, revealing as it did the intimate marital details of her sordid relationship with Alvin Neelley, mandated that she, and she alone, would have to inform the jury of the alleged abuse she suffered. Her defense counsel's opening statement, made at a time when he was unaware of whether or not his client's confession would be admitted, all but told the jury that Mrs. Neelley would take the stand. Under the circumstances, we cannot say that Mrs. Neelley's testimony was impelled by the admission of her allegedly unlawful confession.

III
In Part II of his written order overruling the motion for new trial, see Appendix II, pp. II-6 through II-11, the trial judge thoroughly explored and answered the defendant's contentions concerning the alleged misconduct of juror Eileen Hargis. "`[T]he failure of a juror to make a proper response to a question regarding his qualifications to serve as a juror, regardless of the situation or circumstances, does not *680 automatically entitle one to a new trial.' * * `[t]he test is not whether the defendant was prejudiced but whether he might have been.'" Ex parte O'Leary, 438 So.2d 1372, 1374 (Ala.1983). The trial judge found "no probable prejudice resulted to the defendant from the responses or lack of responses by juror Hargis during the voir dire examination by counsel." The trial judge applied the correct test and the record supports his findings. We find no error in this or in the other allegations of misconduct attributed to juror Hargis. See also Ex parte Troha, 462 So.2d 953 (Ala. 1984).

IV
The trial court properly admitted evidence that subsequent to the murder of Lisa Ann Millican the defendant shot and killed Janice Chapman, shot and attempted to kill John Hancock, and attempted to lure or pick up other victims. This issue was addressed in Part III of the order overruling the motion for new trial. See Appendix II, pp. II-11 through II-12. "Evidence of other distinct criminal acts is admissible when relevant to the crime charged, as bearing on scienter, intent, motive, res gestae, or to establish the identity of the accused (and perhaps as bearing on the issue of insanity when that defense is pleaded in the case)." Garner v. State, 269 Ala. 531, 533, 114 So.2d 385 (1959). See also Ex parte Killough, 438 So.2d 333 (Ala.1983); C. Gamble, McElroy's Alabama Evidence § 69.01 et seq. (3rd ed. 1977).

V
The jury imposed a sentence of life without parole. "The holding in Witherspoon [v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) ], is not applicable where the jury recommends a sentence less than the death sentence. Bumper v. State of North Carolina, 391 U.S. 543 [88 S.Ct. 1788, 20 L.Ed.2d 797]" Eady v. State, 284 Ala. 327, 328, 224 So.2d 876 (1969); Davis v. State, 440 So.2d 1191, 1193 (Ala. Cr.App.1983), cert. denied, Davis v. Alabama, 465 U.S. 1083, 104 S.Ct. 1452, 79 L.Ed.2d 770 (1984). See also Clark v. State, 451 So.2d 368 (Ala.Cr.App.1984). See also Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), "clarifying" Witherspoon.

VI
The offense in this case occurred after the effective date of Alabama's 1981 capital punishment statute and is governed by Alabama Code 1975, § 13A-5-40 (1981) et seq. In reviewing any case in which the death penalty has been imposed, this Court must follow the guidelines set out in § 13A-5-53.
In accordance with § 13A-5-53(a), we have reviewed the entire record, including the trial and sentencing proceedings, for any error adversely affecting the rights of the defendant and have found no error. See also A.R.A.P. Rule 45A.
The trial court properly found the existence of two aggravating circumstances: "The capital offense was committed while the defendant was engaged ... in ... kidnapping" (§ 13A-5-49(4)) and that it was "especially heinous, atrocious and cruel compared to other capital offenses" (§ 13A-5-49(8)). Even a cursory reading of the record and the trial judge's reasons for finding these two aggravating circumstances reveals that his findings are supported by the evidence. See Appendix III, pp. III-6 and III-7.
The trial judge stated his reasons for finding the nonexistence of statutory mitigating circumstances identified in § 13A-5-51(1) through (6). Appendix III, pp. III-8 through III-12. The only statutory mitigating circumstance found to exist was the age of the defendant at the time of the crime (§ 13A-5-51(7)). Appendix III, p. III-12.
The trial judge did find the existence of two nonstatutory mitigating circumstances. Although he found that the offense was not committed while the defendant was under the influence of extreme mental or emotional disturbance, he did find, as a nonstatutory mitigating circumstance, that *681 the "defendant was substantially influenced by her husband." As a second nonstatutory mitigating circumstance, the trial judge considered the fact that Mrs. Neelley "voluntarily and intentionally set in motion the events which led to her arrest and the arrest of her husband." Appendix III, pp. III-12 and III-13. The judge's findings concerning the statutory and nonstatutory mitigating circumstances are supported by the evidence.
The following findings are in compliance with § 13A-5-53(b). First, despite the shocking nature of the criminal acts involved, the record reveals no evidence that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. In this dramatic trial, there is no evidence of prejudicial sensationalism. The trial judge allowed the defense extraordinary latitude but maintained a judicial atmosphere throughout the proceedings. The prosecution was responsible and no foul blows were struck. Defense counsel were passionate in their conscientious representation of their client and no fault can be found in their effectiveness. Counsel far surpassed that standard constitutionally required for the effective assistance of counsel. Strickland v. Washington, 446 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
Second, our independent weighing of the aggravating and mitigating circumstances indicates that death was the proper sentence. This Court has read and reread the testimony of clinical psychologist Margaret Nichols. At the hearing on the motion for new trial, she testified that Mrs. Neelley "probably fits the battered women's syndrome to the most severe extent that [she had] seen." She stated that Alvin's mental state was substituted for hers so that Mrs. Neelley "had no intents of her own." This Court is not insensitive to Mrs. Neelley's defense. However, the Court is also aware of the trial testimony of psychiatrist Alexander Salillas that Mrs. Neelley's actions were not those "of a crazy person, but a demented person," and that, if Mrs. Neelley had been beaten and abused to the extent she testified, she would "probably be dead by now and so disfigured and mentally impaired as to be unable to do anything else at this point in time. * * * She would probably have every bone broken in her body."
There are four conceivable legal issues upon which evidence of the abuse suffered by Mrs. Neelley might have been relevant, namely: (1) duress, (2) insanity, (3) diminished capacity, and (4) mitigation of punishment.
The first, duress, is unavailable as a defense to Mrs. Neelley. Section 13A-3-30, Code of Alabama, 1975, provides that duress is no defense "in a prosecution for murder or any killing of another under aggravated circumstances." Alabama Code § 13A-3-30(d)(1) and (2) (1975). See also Arp v. State, 97 Ala. 5, 12 So. 301 (1893).
While the second, insanity, has been used as a defense in other cases dealing with battered women, see generally Eisenberg and Dillon, Medico-Legal Aspects of Representing the Battered Woman, 5 Okla.City U.L.Rev. 645, 654 (1980); Note, The Battered Wife's Dilemma: To Kill or To Be Killed, 32 Hastings L.J. 895 (1981); Comment, Self-Defense: The Battered Woman Syndrome on Trial, 20 Cal.W.L.Rev. 485, 491, n. 73 (1984), there was absolutely no evidenceexpert or laypresented by the defense that Mrs. Neelley was legally insane under section 13A-3-1, Code of Alabama 1975. The following observation by the court in McKinnon v. State, 405 So.2d 78 (Ala.Cr.App. 1981), applies with equal force here:
"Insanity which will excuse a crime, even under the new criminal code test, must be the result of a `mental disease or defect.' § 13A-3-1, supra. Emotional insanity or temporary mania, not associated with a disease of the mind, does not constitute insanity.
Johnson v. State, 43 Ala.App. 224, 187 So.2d 281 (1966).

"In the present case, there was no evidence that appellant suffered from a `mental disease or defect'". 405 So.2d at 80-81 (emphasis added).
*682 The third legal theory, diminished capacity, is not recognized as a defense in Alabama. See Johnson v. State, supra. See generally Alabama Code 1975, § 13A-3-1 (Commentary). Some commentators have suggested an additional defense for crimes committed by those who suffer from the kind of abuse alleged by Mrs. Neelley. "One researcher suggests that the psychological effects of the Battered Spouse Syndrome can be compared to classic brainwashing", see Steinmetz, Wife Beating: A Critique and Reformulation of Existing Theory, 6 Amer.Acad. of Psych. & Law Bull. 322, 327 (1978) (quoted in Comment, The Battered Spouse Syndrome as a Defense to a Homicide, 26 Vill.L.Rev. 105, 111 (1980)). See also Delgado, Ascription of Criminal States of Mind: Toward A Defense Theory For The Coercively Persuaded ("Brainwashed") Defendant, 63 Minn.L.Rev. 1 (1978). The "brainwashing" defense has not achieved acceptance in any jurisdiction, see Dressler, Professor Delgado's "Brainwashing" Defense: Courting A Determinist Legal System, 63 Minn.L. Rev. 335 (1979).
Finally, the only legal theory upon which Mrs. Neelley's alleged treatment by her husband was relevant was the one the jury properly consideredmitigation of sentence. While the factfinders determined Mrs. Neelley guilty of the crime charged, they apparently considered the evidence of her abuse as indicative of one or more of the following mitigating circumstances outlined in § 13A-5-51, Code of Alabama 1975:
"(2) The capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance;"
* * * * * *
"(5) The defendant acted under extreme duress or under the substantial domination of another person;
"(6) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired."
The brutal reality of the cruel abuse and calculated murder of thirteen-year-old Lisa Ann Millican stands in stark contrast to Mrs. Neelley's allegations of her own abuse and mental condition. This Court agrees with the trial court that "[w]hile the mitigating circumstances and the jury's recommendation of life without parole have weighed heavy in the court's consideration,... they are outweighed by the aggravating circumstances of this horrible crime." Appendix III, p. III-14.
Finally, the sentence of death in this case is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. The death sentence for a murder/kidnapping was imposed in Callahan v. State, 471 So.2d 447 (Ala.Cr.App.1983), reversed on other grounds, Ex parte Callahan, 471 So.2d 463 (Ala.1985), and Heath v. State, 455 So.2d 898 (Ala.Cr.App.1983), affirmed, Ex parte Heath, 455 So.2d 905 (Ala.1984). Although a factor to consider, the fact that Alvin Neelley has not been prosecuted for his involvement in Miss Millican's murder does not render Mrs. Neelley's death sentence disproportionate. Ex parte Womack, 435 So.2d 766 (Ala.1983).
Mrs. Neelley's own defense counsel described her as the "Bride of Frankenstein". Her actions were overwhelmingly demonic and savagely inhuman, generating fear, horror, and shock.
After careful review and consideration, this Court concludes that Judith Ann Neelley received a fair trial and that the sentence of death is proper under the laws of Alabama and of the United States. The judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.

APPENDIX I

THE STATE OF ALABAMA

V.

JUDITH ANN NEELLEY

Case No. CC-82-276
Fort Payne, AlabamaMarch 12, 1983, 9:00 A.M.
*683
 (Trial resumed. Sixth day.)
 (Jury not present.)
 (Defendant and counsel present.)
Appearances:
 For the State:
 Honorable A. Richard Igou
District Attorney
Ninth Judicial Circuit
Fort Payne, Alabama
 Honorable Michael O'Dell
Assistant District Attorney
Ninth Judicial Circuit
Fort Payne, Alabama
 For the Defendant:
 Honorable Robert B. French, Jr.
Honorable Stephen Bussman
Attorneys at Law
Fort Payne, Alabama
THE COURT: All right, gentlemen, the first thing we need to do this morning is to deal with the motion to suppress. As to the statement made by the defendant to Special Agent Burns and other officers on October 14th, 1982, in Murfreesboro, Tennessee, the Court makes the following findings: Number 1, the Court finds that prior to making the statement the defendant was properly advised of her constitutional rights as enumerated in Miranda. Number 2, the Court finds that the defendant made a voluntary and understanding waiver of those rights. Number 3, the Court finds that the defendant made a knowing and voluntary waiver of her right to have counsel present during the interview. Number 4, the Court finds that the defendant was advised on numerous occasions during the interview of her rights and that the interview would be terminated upon her request and that she voluntarily elected to continue the interview. Number 5, the Court finds that the defendant's statement on that occasion was a product of rational intellect and a free will. Number 6, the Court finds that Attorney Bill Burton did not represent the defendant in connection with the criminal offense being investigated by Special Agent Burns and the other officers conducting the interview and that the defendant did not request to have an attorney present during the interview; therefore, the Court finds that the refusal to admit Attorney Burton to the interview room was not an interference with the attorney/client relationship. To the extent, however, that the defendant's statement made on that occasion contains anything about the offense with which she was charged in Murfreesboro, Tennessee, that portion of the statement is inadmissible, because, clearly, Mr. Burton was representing her with regard to those charges. As to the statement made by the defendant to Investigator Danny Smith on October 15, 1981, in Fort Payne, the Court makes the following findings: Number 1, the Court finds that prior to making the statement the defendant was properly advised of her constitutional rights as enumerated in Miranda. Number 2, the Court finds that the defendant made a voluntary and understanding waiver of those rights. Number 3, the Court finds that while there was a remark by Investigator Smith that the information he sought would be related to the Judge for consideration in setting bail, the remark did not constitute a promise or inducement for the defendant making the statement. Number 4, the Court finds that while there was a remark by Investigator Smith about "maybe working out something" whereby the defendant could see her husband, the remark was inconclusive and indefinite and did not constitute a promise or inducement for the defendant making the statement. Number 5, the Court finds that the defendant's statement was a product of rational intellect and a free will. Recognizing that a confession is presumed to be involuntary, the Court, however, finds that there is sufficient evidence to rebut that presumption as to each of the confessions in question. Accordingly, the motion to suppress is denied, and the State may offer the statements as evidence for the jury to consider with the exception of any matters relating to the offense charged in Murfreesboro, Tennessee.

*684 APPENDIX II

STATE OF ALABAMA, Plaintiff

VS.

JUDITH ANN NEELLEY, Defendant IN THE CIRCUIT COURT OF

DEKALB COUNTY, ALABAMA

CASE NUMBER CC-82-276

ORDER
The defendant filed a motion for new trial, and evidence was presented on the motion at hearings before the court on June 21, 1983 and July 1, 1983. The motion is submitted to the court on the evidence, a brief filed by the defendant on August 8, 1983, and the district attorney's response thereto.

I.
The first issue raised by the defendant's motion for new trial is whether the court erred by admitting into evidence two out-of-court confessions made by the defendant to law enforcement officers while she was in custody.
The first confession was made by the defendant while she was incarcerated at the Rutherford County jail in Murfreesboro, Tennessee on forged money order charges. Upon learning that the defendant was incarcerated, an F.B.I. agent from Rome, Georgia and other law enforcement officers investigating the murder of Lisa Ann Millican went to Murfreesboro and interviewed the defendant on October 14, 1982. During the interview, the defendant confessed to the murder of Lisa Millican and related other incriminating information about events leading up to the murder and events which followed.
A Murfreesboro attorney, Bill Burton, had been retained by the defendant's husband to represent the defendant on the forged money order charges, and the attorney had accompanied the defendant to a preliminary hearing on such charges a day or two before October 14. While law enforcement officers were interviewing the defendant, attorney Burton appeared in the hallway outside the interview room and requested that he be allowed to enter the room where the interview was being conducted, but his request was denied.
The defendant contends that this denial, coupled with the fact that she was not told of the attorney's availability, made the defendant's waiver of her right to counsel involuntary and her confession inadmissible.
The court makes the following findings of fact regarding the defendant's statement of October 14, 1982:
a. Prior to making the statement, the defendant was properly advised of her constitutional rights as enumerated in Miranda.

b. The defendant made a voluntary and understanding waiver of her constitutional rights including her right to have counsel present during the interview.
c. The defendant was advised on numerous occasions during the interview of her constitutional rights and that the interview would be terminated upon her request, and she voluntarily elected to continue the interview.
d. The defendant's statements during the interview were the product of a rational intellect and a free will.
e. Attorney Bill Burton did not represent the defendant in connection with the murder of Lisa Millican, the offense about which the defendant was being interviewed, and the refusal to admit him into the interview room was not an interference with the attorney-client relationship.
f. The defendant did not request to have attorney Burton or any other attorney present during the interview.
g. There were no threats, trickery or conjolery practiced by law enforcement officers during the course of the interview, and there was no improper influence, intimidation, coercion *685 or other inducement made to obtain the statement.
h. Considering the totality of the circumstances, the confession was voluntarily made.
The defendant made an additional statement to Investigator Danny Smith on October 15, 1982 after being charged with the murder of Lisa Millican and returned to Fort Payne, Alabama. This statement repeated much of the information related by the defendant in the earlier interview but added some details not furnished earlier.
The defendant contends that this statement was a continuation of the interview which had been conducted the night before in Murfreesboro, and that if the first confession was involuntary, then the second one fails as well.
The court makes the following findings of fact regarding the defendant's statement of October 15, 1982:
a. Prior to making the statement, the defendant was properly advised of her constitutional rights as enumerated in Miranda.

b. The defendant made a voluntary and understanding waiver of her constitutional rights.
c. There were no threats, trickery or conjolery practiced by law enforcement officers during the course of the interview, and there was no improper influence, intimidation, coercion or other inducement made to obtain the statement.
d. The defendant's confession was the product of a rational intellect and a free will.
e. Considering the totality of the circumstances, the defendant's confession was voluntarily made.
The defendant took the witness stand at her trial and admitted that she killed Lisa Millican. The primary difference between her trial testimony and her out-of-court confessions was the motivation she expressed for the killing. In both her trial testimony and her out-of-court confessions, however, she admitted that she shot Lisa Millican and threw her body into a deep canyon after efforts to kill her by injections of liquid drain cleaner failed.
If a defendant takes the stand and admits facts essentially the same as those contained in an out-of-court confession, the defendant cannot complain that the confession was illegally obtained and erroneously admitted into evidence. Thomas v. State, 373 So.2d 1149 (Ala.Cr.App.1979). It is the judgment of this court that even if the confessions were involuntarily made as contended by the defendant, the error of their admission into evidence was cured by the defendant's taking the witness stand and admitting facts essentially the same as those contained in the out-of-court confessions.

II.
The court finds that the juror, Eileen Hargis, was not biased and was not guilty of misconduct prejudicial to the defendant. The court is convinced from the evidence presented at the hearing on defendant's motion for new trial and its own knowledge of events occurring in the courtroom during the trial that the juror did not mouth the words "object, object" to the prosecution during defense counsel's cross-examination of a State's witness. The court finds that the incident on which this allegation is based was, in fact, an effort on the part of the juror to get the attention of the bailiff, Martha McPherson, who was seated near the district attorney.
This allegation of misconduct by the juror was first made by defense counsel at the conclusion of testimony on the day of the alleged incident, at which time, counsel requested that the juror be replaced by an alternate. Before ruling on the request, the court offered defense counsel an opportunity to present evidence in support of the allegation but the offer was declined. The court did not observe the alleged misconduct charged by defense counsel and, therefore, there was absolutely no evidence before the court which would justify removal of the juror; nevertheless, the court reserved a ruling on the request until immediately *686 before submission of the case to the jury so that the court might direct its attention to the juror's demeanor and conduct during that portion of the trial remaining prior to submission.
Immediately prior to submission of the case to the jury, the court denied the request that Mrs. Hargis be replaced. The denial was accompanied by the following statement by the court:
I have observed her very carefully today during the course of these arguments, and I have found her, for the most part, to be very attentive to both your argument (defense counsel's) as well as the State's argument. There were times when she looked away and didn't keep her eyes on either of you, but I think for the most part, I was convinced from her demeanor today that she was appropriately attentive.
The court observed no communication, verbal or non-verbal, between the juror and prosecutors or between the juror and courtroom spectators. The court observed nothing during this lengthy trial which would necessitate or support a finding of misconduct or bias on the part of the juror or that would require her replacement by an alternate juror.
The defendant's allegation that the juror Hargis inappropriately usurped the position of jury foreman is without merit. The allegation is unsupported by the evidence, but even if the evidence supported the allegation, such conduct would not be an indication of bias or corruption in performance of the juror's duty, nor would it indicate that the jury's verdict was wrongfully influenced. See Carr v. Irons, 288 Ala. 211, 259 So.2d 240 (1972). Also, it is a settled principle of law that conduct and remarks of jurors during deliberation are not such "extroneous facts" as will be permitted to impeach a jury's verdict.
The defendant contends that the juror Hargis improperly responded to two voir dire questions propounded by defense counsel, the first of the two questions being as follows:

Attorney French: I talked with you earlier about non-violent crimes and about violent crimes that had perhaps affected you. I want to ask you, just in case I missed itI'm not even going to talk about crime. I'm going to talk about criminal acts, something nobody was prosecuted for. Have any of you or any of your close relatives or close friends ever been involved in a criminal act, and I'll exclude Terry on this. I'm talking about a criminal act that has affected your life.
The juror Hargis did not offer any response to this question. At the hearing on motion for new trial, it was established that Mrs. Hargis had been charged in the District Court of DeKalb County with five cases of worthless checks, all of which were pending at the time of the voir dire examination. Mrs. Hargis testified at the hearing on motion for new trial that although these charges were placed against her, she never believed she had committed a criminal act and that her attorney had advised her that writing the checks was not a criminal act because she lacked criminal intent.
Mrs. Hargis' attorney testified that prior to Mrs. Hargis' involvement in the Neelley trial, he had negotiated a dismissal of the cases against Mrs. Hargis whereby she would pay restitution and court cost, and that the cases remained pending at the time of the Neelley trial solely for payment by Mrs. Hargis of the sums due.
Without regard to Mrs. Hargis' belief about whether she had committed a criminal act by writing worthless checks, a response to defense counsel's question which would reveal the pending charges was not required by Mrs. Hargis because of the context in which the question was asked. The question was prefaced by a reference to an earlier series of questions which sought to elicit if any of the venire had been the victim of criminal activity. In this context, the question set forth above appeared to be calling for responses from any member of the venire who had been the victim of unprosecuted criminal activity. *687 Evidence that this was the intent of the question is found in the fact that defense counsel excluded a member of the venire named "Terry" from the question. In the earlier series of questions, this venireman had revealed that his father was killed by a drunken driver.
Even if the question is construed to call for responses from members of the venire about criminal acts in which they have engaged, it is clear that the question has reference only to criminal acts for which nobody was prosecuted. Because Mrs. Hargis' writing of worthless checks was conduct for which she was prosecuted, such conduct and the resultant charges were not within the scope of the question. The court concludes that the question set forth above did not reasonably seek to elicit the information which defendant now contends was improperly withheld by the juror Hargis.
The second question which the defendant contends was answered improperly by juror Hargis is as follows:

Attorney French: Mr. Igou, (the district attorney), asked you if you knew of myself and the others as part of the defense team. Let me just ask you if you know Richard and Michael, other than Mr. Dilbeck? Richard Igou and Michael O'Dell (the deputy district attorney), do any of you know them?
Mrs. Hargis gave no response to this question. The defendant contends that Mrs. Hargis knew the State's prosecutors as a result of the worthless check charges pending against her and the negotiations which occurred in connection with the disposition of those charges. The evidence, however, does not support this contention. Mrs. Hargis' attorney testified that he handled the negotiations with the district attorney's office and that Mrs. Hargis was not present at the time and had no personal contact with either of the prosecutors. Mrs. Hargis testified that she was not acquainted with either of the prosecutors prior to the commencement of the Neelley trial, and there is no evidence to the contrary. The court finds that Mrs. Hargis was not acquainted with the prosecutors before the trial and that her lack of response to defense counsel's question was not improper.
The court finds no probable prejudice resulted to the defendant from the responses or lack of responses by juror Hargis during the voir dire examination by counsel.
Further, the defendant alleges that the prosecutors wrongfully withheld from defense counsel their knowledge of Mrs. Hargis' pending cases. Assuming arguendo that the prosecutors had a duty to make such disclosure, the court finds that there was no breach of that duty because the information was not brought to their attention until after the jury was struck and impaneled. This finding is based on the testimony of Deputy District Attorney Michael O'Dell that he did not connect juror Hargis with the worthless check charges until it was called to his attention by an employee of the clerk's office after the jury was struck.

III.
The defendant contends that it was error for the court to allow evidence of the following events which occurred subsequent to the killing of Lisa Ann Millican: (a) that the defendant shot John Hancock, (b) that the defendant shot and killed Janice Chapman, and (c) that the defendant attempted to lure other potential victims.
The evidence in this case established that the abduction of Lisa Ann Millican was part of a bizarre scheme whereby the defendant attempted to lure girls and young women into the car with her for the ultimate purpose of making them available to her husband for sex. For several days immediately prior to Lisa Millican's abduction, the defendant and her husband drove up and down the streets of Rome, Georgia in separate automobiles looking for girls who would be suitable. When the defendant's husband would see a suitable girl, he would communicate with the defendant by CB radio, and the defendant would invite the girl to go riding around with her. Numerous *688 girls refused the defendant's invitation; her first successful pick-up was Lisa Millican. After Lisa Millican was killed, the defendant and her husband went back to Rome and continued to look for girls. Five days after the death of Lisa Millican, the defendant picked up a young woman named Janice Chapman and her common-law husband, John Hancock, from a street in Rome. Later that night, the defendant shot Hancock in the back and left him for deadalthough he survived. The defendant and her husband took Janice Chapman to a motel where the husband engaged in sex with Janice. The next day, the defendant killed Janice, shooting her once in the back and twice in the chest. Less than a week thereafter, the defendant picked up yet another young woman who also became a sexual companion for her husband.
It is settled law that evidence of the accused's commission of another crime is admissible if it tends to prove that the crime presently charged was committed pursuant to a single plan, design, scheme or system. The evidence of which the defendant complains was admitted for that purpose and its admissibility clearly is within the scope of the stated rule.

IV.
An additional ground of the defendant's motion is her assertion that there were emotional outbursts in the courtroom during the trial which, along with comments from spectators, prejudiced jurors against the defendant. An emotional outburst from spectators occurred on one occasion but the jury was not in the courtroom at that time. The outburst was in the form of applause from certain members of the audience during a suppression hearing from which the jurors had been excluded. The court finds that no prejudice to the defendant resulted from this occurrence.
Two media representatives who covered the trial and three other spectators testified at the hearing on motion for new trial that they overheard prejudicial remarks made by individual courtroom spectators at various times during the trial which were loud enough for jurors to hear. The court did not hear the remarks and concludes that any such remarks were not heard by the jury. This conclusion is based upon the court's observations during the trial of which it takes judicial notice, the testimony of jurors who testified at the hearing on motion for new trial that they did not hear the remarks and, further, upon the fact that spectator comments were less likely to be heard by the jury than by media representatives and other spectators because of the physical layout of the courtroom.
Because public interest in this trial was high and spectator seats were filled every day with additional spectators waiting outside the courtroom to enter, the court employed procedures designed to prevent spectator interference with the fair and orderly conduct of the trial. The following are some of the special procedures:
a. Spectators were allowed in the courtroom only to the extent that there were seats to accommodate them.
b. Law enforcement personnel provided security at the door of the courtroom to regulate the entrance by spectators.
c. The court routinely instructed spectators that they should not talk aloud or whisper while the jury was in the courtroom.
d. Law enforcement personnel were stationed in the spectator section, with orders from the court to remove spectators who did not comply with the court's instructions.
e. A row of seats across the front of the spectator section was reserved for news media representatives; thus the media representatives sat between the jury and the spectators.
The court adopted early in the trial a firm approach to spectator behavior, and gave close attention to the spectator section during much of the trial when other matters did not require the court's attention. On one occasion, the court privately reprimanded a spectator who sat near the back *689 of the courtroom for making facial expressions in response to the testimony of a witness. This incident was not observed by the jury and at no time during the trial did the court see or hear any misconduct from a spectator which appeared to have been observed by a juror. The spectator section was orderly at all times, with the exception of the one emotional outburst mentioned above which occurred when the jury was not in the courtroom, and the court finds that the defendant was not prejudiced by spectator conduct.

V.
In support of her motion for new trial, the defendant offered the testimony of Dr. Margaret Nichols, a clinical psychologist, experienced in counseling battered women. The essence of Dr. Nichols' testimony was that the defendant's behavior pattern fits the battered woman syndrome, and that the defendant was, in Dr. Nichols' judgment, totally under the control of her husband at the time she killed Lisa Millican. These conclusions were based upon an interview with the defendant conducted by Dr. Nichols on the day before the hearing and upon relevant information supplied by the defendant's counsel.
For the court to grant a new trial on the basis of newly discovered evidence, the defendant must meet the following requirements: (1) that the evidence is such as will probably change the result if a new trial is granted, (2) that the evidence has been discovered since the trial, (3) that it could not have been discovered before trial by the exercise of due diligence (4) that it is material to the issues, and (5) that it is not merely cumulative or impeaching.
The court finds that Dr. Nichols' testimony is not such evidence as would probably change the result in a new trial, and further finds that evidence from an expert witness in the same field as Dr. Nichols could have been discovered before trial by the exercise of due diligence. It follows that Dr. Nichols' testimony is insufficient evidence on which to grant a new trial.

VI.
The court has examined all the grounds asserted by the defendant in her motion and finds that none of them merits the granting of a new trial. It is the judgment of the court that the defendant received a fair trial free from error prejudicial to her rights and, accordingly, IT IS ADJUDGED AND DECREED that the motion for new trial, as amended, is denied.
 DATED SEPTEMBER 6 , 1983.
 /s/Randall L. Cole
 CIRCUIT JUDGE
Copy of this order to Honorable A. Richard Igou, Honorable Robert B. French, Jr. and Honorable Stephen P. Bussman.

APPENDIX III

STATE OF ALABAMA, Plaintiff

VS.

JUDITH ANN NEELLEY, Defendant IN THE CIRCUIT COURT OF

DEKALB COUNTY, ALABAMA

CASE NUMBER CC 82 276

SENTENCING ORDER
The defendant was charged by indictment with the murder of Lisa Ann Millican during a kidnapping in the first degree, a capital offense. A jury returned a verdict on March 22, 1983 finding the defendant guilty of the capital offense, whereupon, the court adjudged the defendant guilty in accordance with the jury's verdict.
Following the adjudication of guilt, a separate sentence hearing was conducted before the same jury, and the jury returned a recommendation that the defendant be sentenced to life without parole.
The court has ordered and received a written pre-sentence investigation report and has conducted an additional sentence hearing pursuant to Section 13A-5-47, Code of Alabama (Recomp.1975). At the sentence hearing, the State, through its district attorney, urged that the court fix the defendant's punishment at death. The defendant, through her counsel, argued *690 that the court should fix her punishment, in accordance with the jury's recommendation, at life in prison without parole.

FINDING OF FACTS SUMMARIZING THE CRIME AND THE DEFENDANT'S PARTICIPATION IN IT
The body of Lisa Ann Millican, age 13, was found in a gorge known as Little River Canyon near Fort Payne on September 29, 1982. Lisa was a resident of the Ethel Harpst Home, a Methodist home for neglected children located in Cedartown, Georgia.
Lisa and five other girls from the home were taken by a house parent on an outing to Riverbend Mall in Rome, Georgia on September 25, 1982. While at the mall, Lisa became separated from the others. During this separation, she was abducted by the defendant, who asked Lisa to go "riding around." Lisa hesitated at first, but then agreed. The events which followed the abduction led to the death of Lisa when the defendant shot her in the back on September 28, 1982, and threw her body into the canyon.
The abduction of Lisa Ann Millican was part of a bizarre scheme whereby the defendant attempted to lure girls and young women into the car with her for the ultimate purpose of making them available to her husband, Alvin Neelley, for sex with him. For several days immediately prior to Lisa's abduction, the defendant and Alvin drove up and down Rome streets in separate automobiles looking for girls who would be suitable. When Alvin would see one who appealed to him, he would communicate with the defendant by C-B radio, and the defendant would invite the girl to go riding around with her. Numerous girls refused the defendant's invitation; her first successful pick-up was Lisa Ann Millican.
The defendant took Lisa to a motel in Franklin, Georgia where she tried to persuade Lisa to submit to sex with Alvin, but Lisa resisted. Finally, Alvin told Lisa that if she did not submit to sex, the defendant would kill her. Following this threat, Alvin engaged in sex with Lisa, and later that night, Lisa was handcuffed to the bed to prevent her escape.
The next day, the defendant and Alvin, traveling in two cars, took Lisa with them to Cleveland, Tennessee where they picked up their two-year-old twins who were being cared for by Alvin's mother. Later that day, they traveled to Scottsboro, Alabama where they rented a motel room. Shortly after their arrival at the motel, the defendant hit Lisa in the head several times with a slapjack in an attempt to render her unconscious, but she was unsuccessful in achieving that result. Alvin then had sex with Lisa, and afterward Lisa slept overnight on the floor, unclothed, and handcuffed to the bed.
The following day, Alvin had sex with Lisa twice more despite her cries and pleas that he stop. The defendant was present during these sexual encounters and at one point during the day, she handcuffed Lisa to the plumbing in the bathroom and interrogated her about a man she had appeared to know at a dairy bar near the motel.
The next morning, Lisa was taken to Little River Canyon by the defendant where the defendant instructed Lisa to lie face down and place her hands around a tree. The defendant then handcuffed Lisa's hands. She explained to Lisa that she was going to give her a shot that would make her fall asleep and that when she waked up, Lisa would be free to go. Using a needle and syringe, the defendant injected Lisa in the neck with liquid drain cleaner. When Lisa did not die in five minutes, the defendant injected her again in the neck. She injected Lisa four additional times, twice in the arms and twice in the buttocks, waiting about five minutes after each injection for Lisa to die. Twice during the infliction of these injections, Lisa requested to get up and "use the bathroom" in the woods. She was allowed to do so, and each time she returned and resumed her position on the ground with her hands around the tree.
*691 Following the last injection, the defendant instructed Lisa to walk around for awhile to hasten the work of the poison in her body. When it finally appeared that Lisa was not going to die from the drain cleaner, the defendant marched Lisa to the rim of the canyon to shoot her in the back in a manner that would cause her body to fall into the canyon. Lisa begged to go back to the Harpst Home and promised not to tell what had happened. The defendant told Lisa to be quiet and then shot her in the back. Lisa fell backward toward the defendant instead of falling into the canyon. The defendant picked up the body and, using her knee, propelled it into the canyon.
During the defendant's trial testimony, she testified that Alvin was present at the canyon directing her every action. However, in an out-of-court statement made shortly after her arrest, the defendant stated that Alvin was not present at the canyon.
Five days after the death of Lisa Ann Millican, the defendant picked up a young woman named Janice Chapman and her common-law husband, John Hancock, from a street in Rome. Later that night, the defendant shot John Hancock in the back and left him for dead. He survived, however, and was present at the trial to testify to the incident.
The defendant and Alvin took Janice Chapman to a motel in Rome where Alvin engaged in sex with Janice. The next day, the defendant killed Janice Chapman, shooting her once in the back and twice in the chest. During the defendant's trial testimony, she testified that Alvin was present during the shooting of John Hancock and Janice Chapman and that he directed her to shoot them; however, in her out-of-court statement given shortly after her arrest, she stated that Alvin was present when she shot John Hancock but that he was not present when she killed Janice Chapman.
On October 9, 1982, the day before the defendant's arrest, she picked up another young woman in Nashville, Tennessee who was present with the defendant and Alvin in a motel room in Murfreesboro, Tennessee on October 10, 1982 when the defendant was arrested on a bad check charge. Later, this woman was released by Alvin unharmed.
Alvin was arrested in Murfreesboro on October 13, 1982, also on a bad check charge. While the defendant and Alvin were in custody on the bad check charges, additional charges were placed against them arising from the murders of Lisa Ann Millican and Janice Chapman, and the shooting of John Hancock.

FINDINGS CONCERNING THE EXISTENCE OR NON-EXISTENCE OF AGGRAVATING CIRCUMSTANCES
In compliance with the requirements of the law that the trial court shall enter specific findings concerning the existence or non-existence of each aggravating circumstance enumerated by statute, the court finds that none of the aggravating circumstances enumerated by statute were proved beyond a reasonable doubt in the proceedings before this court except the following, which the court finds were proved beyond a reasonable doubt:
1. The capital offense was committed while the defendant was engaged in kidnapping. The jury's verdict establishes the existence of this aggravating circumstance, and the verdict is supported by the evidence.
2. The capital offense was especially heinous, atrocious and cruel compared to other capital offenses. The court reaches the conclusion that this aggravating circumstance exists based upon uncontroverted evidence of the following:
a. The victim of the crime was a child, age 13.
b. Repeatedly, the child was abused and violated sexually causing her enormous fright and pain. While the evidence is insufficient to establish that the defendant participated in sex acts upon the child, she was an accomplice *692 to the sexual abuse perpetrated upon the child by Alvin Neelley.
c. The defendant inflicted pain and suffering upon the child by hitting her on the head with a slapjack in an attempt to knock her unconscious.
d. The defendant physically restrained the child much of the time following her abduction by the use of handcuffs.
e. The defendant made the child lie on the ground with her hands handcuffed around a tree while the defendant injected her six times with liquid drain cleaner.
f. The defendant marched the child to the rim of the deep canyon, with the child begging to be released, where the defendant shot her in the back.
By any standard acceptable to civilized society, this crime was extremely wicked and shockingly evil. It was perpetrated with a design to inflict a high degree of pain with utter indifference to the suffering of the victim. The court recognizes that all capital offenses are heinous, atrocious and cruel to some extent, but the degree of heinousness, atrociousness and cruelty which characterizes this offense exceeds that which is common to all capital offenses.

FINDINGS CONCERNING THE EXISTENCE OR NON-EXISTENCE OF MITIGATING CIRCUMSTANCES

I.
In compliance with the statutory requirement that the trial court enter specific findings concerning the existence or non-existence of each mitigating circumstance enumerated by statute, the court finds that none of the following mitigating circumstances exist in this case:
1. That the defendant has no significant history of prior criminal activity. The defendant testified to a significant history of criminal conduct. When she was 16 years of age, she robbed a woman of her purse at gunpoint. As a result of this offense, she was committed to the Georgia Youth Development Center, and her husband, Alvin, who was an accomplice to the robbery, was sentenced to a term in the Georgia State Penitentiary.
The defendant was released from the Georgia Youth Development Center in December, 1981 and Alvin was released from the penitentiary several months later. The defendant testified that upon Alvin's release, he was obsessed with the notion that she had been sexually abused by employees at the Youth Development Centers in Rome and Macon. To avenge the alleged wrong, Alvin and the defendant set out to kill or terrorize employees of the YDC. Pursuant to this objective, they shot into the house of one employee and attempted to firebomb the automobile of another in Rome. In Macon, the defendant attempted to lure YDC employees to a motel room where Alvin was prepared to kill them. The defendant was unsuccessful in luring any employees to the motel, and none were harmed.
Additional criminal activity by the defendant, according to her own testimony, includes writing bad checks, raising the amounts on money orders, stealing checks from post office boxes and cashing them with false identification, and stealing from convenience stores where Alvin was employed.
2. That the capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance. When the defendant was arraigned on December 17, 1982, her counsel requested that the defendant be committed to Bryce Hospital for psychiatric examination and evaluation. The court granted the request, and the defendant thereafter underwent psychiatric examination and evaluation at Bryce Hospital. Dr. Alexander Salillas, a staff psychiatrist at Taylor Hardin Secure Medical Facility and a consultant at Bryce, testified that as a result of his examination of the defendant, he found no mental disease or defect and that, in his opinion, she knew right from wrong at the time of the offense and that she acted with deliberation and premeditation.
*693 While the court recognizes that this mitigating circumstance contemplates a disturbance of the mind which might exist separate and apart from a mental disease or defect, and that the testimony of the psychiatrist is, by no means, conclusive, the court finds from a consideration of all the evidence that the defendant was not under the influence of extreme mental or emotional disturbance.
3. That the victim was a participant in the defendant's conduct or consented to it. There is no support for this mitigating circumstance. Although Lisa Ann Millican initially agreed to go with the defendant when the defendant picked her up at the mall in Rome, the fact that Lisa was less than 16 years old and that the Harpst Home, which had legal custody of her, had not acquiesced to her being taken by the defendant, makes any consent given by Lisa legally ineffectual. Any consent given by the child to the acts of violence and abuse committed upon her was the result of threats or false promises and provides no support for this mitigating circumstance.
4. That the defendant was an accomplice in the capital offense committed by another person and her participation was relatively minor. The evidence is uncontroverted that the defendant abducted Lisa Ann Millican, that the defendant injected her six times with liquid drain cleaners, and that the defendant shot her in the back and threw her body into the canyon. Although there is evidence that the defendant's husband, Alvin, was also involved in this criminal conduct, there is no support for a finding that the defendant's participation was relatively minor.
5. That the defendant acted under extreme duress or under the substantial influence of another person. The defendant's primary contention throughout the trial and the sentence hearings was that she had become completely submissive to the will of her husband, Alvin, and that he exercised total control over her. Perhaps the strongest support for this contention is found in the following:
a. testimony by Alvin's former wife that Alvin dominated their relationship and imposed his will upon her;
b. evidence including pictures of the defendant's bruised body, that Alvin beat the defendant frequently;
c. letters written by Alvin while he was incarcerated in the penitentiary which portray him as a vile and dominant husband; and
d. the fact that the defendant had no record of criminal activity prior to her association with Alvin Neelley.
The evidence cited above, together with the defendant's testimony, convinces the court that the defendant was substantially influenced by her husband, but the court concludes that the husband's influence did not constitute extreme duress or substantial domination.
The defendant is an intelligent person capable of making independent choices. The evidence is substantial that she made a willing choice to follow her husband's influence rather than to depart from it. There were numerous opportunities for the defendant to break with her husband and seek help had she felt the need or been so inclined. These opportunities were enhanced by the fact that the defendant was armed and traveling in a separate vehicle during most of their exploits. Ultimately, the defendant chose, rather than to make the break or turn on her husband, to brutally murder Lisa Ann Millican.
The court finds that the defendant was not brainwashed and that she retained her will and her capacity to make independent choices.
6. That the capacity of the defendant to appreciate the criminality of her conduct or to conform her conduct to the requirements of law was substantially impaired. The defendant entered a plea of not guilty by reason of mental disease or defect. With regard to this defense, the court instructed the jury that a person is not responsible for criminal conduct if at the time of such conduct, as a result of mental disease or defect, such person lacks *694 substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. By its verdict of guilt, the jury found the evidence insufficient to support the plea of insanity, and the jury's finding is supported by the evidence. While the court recognizes that this mitigating circumstance contemplates impaired capacity which might exist separate and apart from a mental disease or defect, the court finds from a consideration of Dr. Salillas' testimony and the evidence as a whole that this mitigating circumstance does not exist.

II.
The court finds that the following mitigating circumstance enumerated by statute does exist in this case:
1. The age of the defendant at the time of the crime. The defendant was 18 years of age at the time she committed the capital offense of which she is convicted. While the court finds the defendant's age to be a mitigating circumstance, the court considers the weight to be given this circumstance lessened by the fact that the defendant, since a much earlier age, had adopted the lifestyle of an adult. She commenced a marital relationship with Alvin Neelley when she was age 15, and gave birth to twins when she was age 16. The criminal activity in which the defendant engaged was less akin to the behavior of a teenager and more akin to the conduct of a seasoned criminal.

III.
The court finds two additional mitigating circumstances not enumerated by the statute:
1. The defendant was substantially influenced by her husband. Although the court has heretofore found that the husband's influence did not constitute extreme duress or substantial domination, it seems appropriate that such influence should be given weight as a mitigating circumstance.
2. The defendant voluntarily and intentionally set in motion the events which led to her arrest and the arrest of her husband, thus ending the reign of terror which they had perpetrated throughout three states. The defendant did this while at her mother's house in Murfreesboro by instructing her mother to notify the police that she was in the area and could be arrested on bad check charges pending against her. In the defendant's testimony, she could not explain what prompted her to give her mother these instructions, but it is fair to infer that conscience had a hand in it.

CONCLUSION
The court has carefully weighed the aggravating and mitigating circumstances which it finds to exist in this case, and has given consideration to the recommendation of the jury contained in its advisory verdict. While the mitigating circumstances and the jury's recommendation of life without parole have weighed heavy in the court's consideration, it is the judgment of this court that they are outweighed by the aggravating circumstances of this horrible crime. Accordingly, IT IS ORDERED, ADJUDGED, AND DECREED that the defendant shall be punished by death.
A formal sentencing entry shall be made by separate order.
 DATED APRIL 18, 1983.
 /s/Randall L. Cole
 CIRCUIT JUDGE

ON REHEARING
BOWEN, Presiding Judge.

I
Mrs. Neelley claims that the warrantless search of her mother's home by the Tennessee authorities on the night of October 14, 1982 (during the time Mrs. Neelley was being interrogated) was illegal because her mother did not voluntarily consent to the search.
Initially, we question whether Mrs. Neelley has standing to raise this issue, see Rakas v. Illinois, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); Cochran v. State, [Ms. 6 Div. 886, April 24, 1984] *695 (Ala.Cr.App.1984). See also Hilley v. State, 484 So.2d 476 (Ala.Cr.App.1985) (defendant held to have abandoned belongings stored at her mother-in-law's house). Moreover, even if the issue is properly before us, the record clearly indicates that the search was a consensual one.
Barbara Adams, Mrs. Neelley's mother, testified at the hearing on motion for new trial that on the evening of October 14, 1982, six or seven Murfreesboro police officers came to her home and asked to search the premises:
"Well, it was late in the afternoon. I'd say about five. It was getting, you know, kind of dark, not very. And David Grissom was there and there was a guy behind him in a suit and two car loads of men with guns and everything and badges, and they said they needed to search my house, and they didn't tell me what for or anything, and I was scared anyway, you know. So, I told them to come on in and search and they did....
"They just asked if they could search my house. They said they could get a warrant, and I said, `What for', and he didn't say anything. He just said, `We need to search your home.' So, I said, `Just go on in', you know." (R. 2404-05)
The Tennessee authorities were led by one David Grissom, whom Mrs. Adams said she knew "very well." In response to the District Attorney's cross-examination, Mrs. Adams testified:
"Q Are you frightened of David Grissom?
"A Oh, no, not him.
"Q Is he one of the men who came up there?
"A He came up there with them because he knows me.
"Q Did any of them threaten you in any way?
"A Oh, no. They, ah
"Q Were they polite to you?
"A They were very polite. They didn't disturb anything. When they searched they put everything back where it was originally.
"Q When they first came up and asked you if they could search, were they polite at that time?
"A Yes.
"Q And David Grissom, whom you knew and whom you were not afraid of, was with them?
"A That's right."
In our judgment, the foregoing evidence supports a finding that Mrs. Adams's consent to search her home was freely and voluntarily given. As this court held, under similar facts, in Phillips v. State, 447 So.2d 1312, 1316 (Ala.Cr.App.1984), cert. denied, 471 U.S. 1019, 105 S.Ct. 2047, 85 L.Ed.2d 309 (1985), "[T]he appellant's father gave consent for the search to be made of the premises in question and he in fact, being the owner, had the authority to do so."

II
Mrs. Neelley insists that the misconduct of juror Eileen Hargis entitles her to a new trial. She claims that Juror Hargis was inattentive, glared at defense counsel, repeatedly smiled at the prosecution, mouthed the words "object, object" to the District Attorney during questioning of a witness by the defense, and usurped the role of foreperson of the jury. The trial judge held an extensive hearing on the foregoing allegations, and we have thoroughly reviewed the record of this hearing. We can only reiterate that the trial court heard the witnesses, observed their demeanor, and, in fact, observed Mrs. Hargis's behavior as a juror throughout the trial, and, more specifically, toward the end of the trial when her alleged misconduct was called to the court's attention. The trial court's finding that there was "nothing during this lengthy trial which would necessitate or support a finding of misconduct or bias on the part of the juror or that would require her replacement by an alternate juror" is supported y the record and will not be disturbed on appeal. See Adams v. State, 32 Ala.App. 367, 26 So.2d 216 (1946).
*696 An additional allegation, which Mrs. Neelley maintains that we did not address thoroughly on initial deliverance of our opinion in this case, is that juror Hargis failed to respond to the following voir dire questions by defense counsel:
"I talked with you earlier about nonviolent crimes and about violent crimes that had perhaps affected you. I want to now ask you, just in case I missed it I'm not even going to talk about crime. I'm just going to talk about criminal acts, something nobody was prosecuted for. Have any of you or any of your close relatives or close friends ever been involved in a criminal act ... I'm talking about a criminal act that has affected your life."
"Mr. Igou [the District Attorney], asked you if you knew of myself and the others as part of the defense team. Let me just ask you if you know Richard and Michael... Richard Igou and Michael O'Dell [the deputy district attorney], do any of you know them?"
Testimony taken at the hearing on motion for new trial established that at the time of voir dire examination, Mrs. Hargis had five criminal charges of issuing worthless checks pending in the District Court of DeKalb County. Prior to Mrs. Hargis's jury service in the Neelley trial, her attorney for the worthless check cases had negotiated an agreement with deputy district attorney Michael O'Dell whereby Mrs. Hargis would have 90 days to pay restitution and court costs, and the criminal charges against her would be dismissed.
Mrs. Hargis testified that she did not respond to the first voir dire question because, although she was aware she had worthless check charges pending against her, she did not believe herself guilty of a crime in issuing the checks since her attorney had told her that, under the law, she had no criminal intent. She explained that the bad checks arose during a period when her husband was out of town and both he and she were writing checks without full knowledge of what the other was doing. Mrs. Hargis did not respond to the next voir dire question because all negotiations regarding the cases against her were conducted between her attorney and the assistant prosecutor. She never met Michael O'Dell and had no idea he was connected with her cases in District Court.
Deputy district attorney Michael O'Dell testified that, at the time of voir dire examination of the Neelley venire, he had no recollection of having negotiated an agreement regarding worthless check charges with the attorney for Mrs. Hargis. Although O'Dell acknowledged that he later learned Mrs. Hargis's charges were pending at the time of the Neelley trial and were dismissed shortly after the conclusion of the Neelley case, O'Dell testified that, for all practical purposes, the cases had already been disposed of prior to the Neelley case. O'Dell stated that he considered the cases completed as of the date he concluded his agreement with Mrs. Hargis's attorney. The cases remained open for 90 days according to O'Dell simply for payment by Mrs. Hargis.
Mrs. Neelley claims that the State's failure to disclose the information about Mrs. Hargis, once it had knowledge of the juror's pending criminal charges, constitutes suppression of facts prejudicial to the defense. Initially we note that, even had Mr. O'Dell remembered Mrs. Hargis's pending criminal cases at the time of voir dire questioning, he would have had no absolute duty to disclose the information to the defense. See generally, Annot., 86 A.L.R.3d 571 (1978) (disclosure to defense counsel of prosecution information regarding a prospective juror's criminal record not required in the absence of a showing of prejudice to defendant's rights).
O'Dell testified that, once he learned of Mrs. Hargis's pending criminal cases, he was very concerned that she had been left on the jury. He stated that if he had remembered the information earlier he would have used one of the State's peremptory strikes to eliminate Mrs. Hargis from the jury. O'Dell said that generally he would consider anyone with pending criminal *697 charges a juror unfavorable to the State.
Because there was no purposeful withholding of information material to the defense, cf. Toole v. State, 146 Ga.App. 305, 246 S.E.2d 338 (1978) (disclosure of prior voting patterns of jurors not discoverable as evidence "exculpatory" to the defense), and because Mrs. Hargis's criminal cases could be construed to place her in a posture favorable to either the defense or the prosecution, we do not believe the State's failure to divulge the information here constitutes reversible error. It would be pure speculation on our part to assume, as Mrs. Neelley contends, that a juror with pending criminal charges is more conviction prone. The likelihood is just as great that the juror would be sympathetic to the defense. Under the circumstances, we must agree with the trial court's finding that Mrs. Hargis's failure to respond to the voir dire questions did not result in probable prejudice to the accused. Ex parte O'Leary, supra.
OPINION EXTENDED; APPLICATION FOR REHEARING OVERRULED.
All Judges concur.