[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1023 
The appellant, Larry D. Dunaway, Jr., was charged with two counts of capital murder for the killings of Tressa M. Patterson and James Anthony Bernard Patterson. The murder of Tressa Patterson was made capital because it occurred during the commission by the appellant of arson in the first or second degree. See § 13A-5-40 (a)(9), Ala. Code 1975. The murder of James Patterson was made capital because the victim was less than 14 years of age. See § 13A-5-40 (a)(15), Ala. Code 1975. The jury found the appellant guilty of both counts of capital murder. Following a sentencing hearing, the jury, by a vote of 7-5, recommended that the appellant be sentenced to life imprisonment without the possibility of parole for the murder of Tressa Patterson. By a vote of 10-2, the jury recommended a sentence of death by electrocution for the murder of James Patterson. The trial court accepted the jury's recommendations and sentenced the appellant to life imprisonment without the possibility of parole for the murder of Tressa Patterson and to death by electrocution for the death of James Patterson.
The evidence showed that the appellant lived with his girlfriend, Tressa Patterson, and her son, James Patterson, in a mobile home in Barbour County. On the evening of January 8, 1997, the mobile home burned. Investigators subsequently discovered the burned bodies of Tressa Patterson and James Patterson, who was 22 months old, in the remains of the mobile home.
Around 9:00 p.m. on January 8, 1997, the appellant went to Jody Lynne Drenner's residence and told her his mobile home was on fire. He told Drenner he had gone to Clayton half an hour earlier and returned to find his mobile home on fire. The appellant stated that he hoped *Page 1024 
his girlfriend and her child were not in the burning mobile home.
The appellant also went to the mobile home of John Phillips and asked if Tressa and James were there. When Phillips said they were not there, the appellant hesitated and then told them about the fire. The appellant did not appear to be upset when he spoke about the fire. In fact, Phillips stated that the appellant did not seem upset until later when Jody Drenner was holding him and trying to calm him down. Phillips also testified that he saw the appellant on a regular basis and that he had always appeared to him to be normal. He stated that the appellant had never done anything to make him think the appellant was insane.
Mary Lou Russaw testified that, on the night of January 8, 1997, the appellant stopped at her mobile home and asked her if Tressa was with her. She told him that Tressa was not there and must be at home. The appellant then told Russaw that Tressa was not at home and that "[t]he house is on fire." Later, at the scene of the fire, Russaw asked the appellant where Tressa and James were. The appellant first responded that he did not know, but then stated that they were in the mobile home when he left.
Randy Hickman was present at the scene of the fire. As he walked toward the burning mobile home, the appellant told Hickman he had sold some drugs and someone had just dropped him off. Hickman noticed that the appellant did not show much emotion initially, but began to show more a few minutes later. He also testified that the appellant seemed normal and did not appear to be suffering from a mental illness.
Annie Lou McCoy, Tressa Patterson's mother, saw the appellant at the scene of the fire. When she asked him where Tressa and James were, he first told her they were at her house. She responded that they were not at her house, and he changed his story. He told her Tressa was inside the mobile home on the couch, probably sleeping, and James was with someone named Patricia. He also stated that the stove probably started the fire.
Don Dykes, who owned the mobile home park in which most of the witnesses to the fire lived, testified that the appellant had done work for him on three occasions. He stated that the appellant followed instructions and did the work properly. Dykes also testified that the appellant never acted "unusual" or like he did not have good sense.
Deputy State Fire Marshal Edward Paulk investigated the fire. Paulk testified that the fire started in the living room area and that it consumed the center of the room. He determined that the fire was not caused by accidental or natural causes. He also testified that alcohol could have been used as an accelerant, but that evidence it had been so used would have been destroyed by the water used to extinguish the fire.
In the course of his investigation, Paulk interviewed the appellant. The appellant made an oral statement and gave a written statement about the fire. In his oral statement, the appellant claimed that he was not present when the fire began. He stated that he had ridden with a "crack-head" in a red pickup truck into Clayton, where he hoped to sell some crack cocaine. He claimed that he decided not to sell the crack, that the man dropped him off on Highway 239 near his mobile home, and that he walked home from there. The appellant claimed that he first saw the fire while he was walking home. He stated that the last time he saw Tressa, she was lying on the couch and James was with her.
Subsequently, the appellant admitted to Paulk that the story about the man in the red truck was not true. Paulk then asked the appellant if he could take a written statement from him, and the appellant agreed. In that statement, the appellant admitted that he and Tressa had been having problems in their relationship since *Page 1025 
Thanksgiving of 1996, He stated that Tressa had told him to move out by December 26, 1996, that he had not moved out, and that they had been arguing since December 26, 1996. On or about January 5, 1997, when the appellant still had not moved out, Tressa removed his clothing from the mobile home.
On January 8, 1997, the appellant watched over James while Tressa was at work. He stated that he and Tressa got into another argument when she came home from work, and that he put a rifle to his head to show his "love" for her. He claimed that he pulled the trigger, but it did not fire. He then laid the rifle on his lap and accidentally fired it at Tressa. The appellant stated that Tressa gasped when she was struck by the first bullet. The noise caused him to panic and he accidentally fired the rifle a second time. The appellant told Paulk that after he determined that Tressa was dead, he said to James, "Man, yo momma's dead." He then poured rubbing alcohol over Tressa's body and beside the fireplace in the living room. He laid James down near his mother's body and set the alcohol on fire. He then fled to a nearby wooded area and hid the rifle.
The appellant testified at trial in his own defense. He testified that his mother suffered from paranoid schizophrenia, and that he had heard voices telling him what to do since he was a child. His trial testimony about the murders was similar to his statement to Paulk, except that he testified that voices started talking to him while he was in the mobile home. He stated that he did not remember everything he did between the time he shot Tressa and the time he realized he was in the woods, and he added that he was not in control of himself at the time. He contended that he did what the voices told him to do. He testified that he made up the story about going to Clayton because he was scared and nervous. He also admitted that, in spite of his statements immediately following the fire, he knew Tressa and James were in the mobile home when it was burning.
During his testimony, the appellant admitted that he had previously been convicted, pursuant to a guilty plea, of carjacking in Louisiana. He also admitted that a weapon had been used to commit the crime.
Dr. James Lauridson, the medical examiner, testified that Tressa died from a gunshot wound to the chest. He determined that she was badly injured before the appellant started the fire, but she probably did not die instantly. There was no carbon monoxide in her blood and no sign of inhaled smoke or soot in her airways. Therefore, Lauridson concluded that she may not have been breathing when the fire began.
Lauridson testified that James's body showed no signs that he had suffered any injuries before the fire. There was a great deal of soot in his windpipe, indicating that he. was probably alive when the fire became fully developed. Toxicological tests revealed that James had a fatal level of carbon monoxide in his blood. Lauridson stated that James died because he choked to death while inhaling smoke and other by-products of the fire.
To determine what, if any, accelerant the appellant used to start the fire, Mary Rhodes Holt, a forensic scientist employed by the Department of Forensic Sciences, performed a gas chromatograph test on the residue collected under the couch where Tressa's body was found. Holt specifically tested this residue for the presence of rubbing alcohol, but the test did not detect any alcohol. Holt explained that alcohol is one of the most difficult accelerants to discover in an arson investigation because it evaporates quickly due to the heat of fire and because it readily mixes with water, the primary agent used to extinguish fires.
The appellant initially entered a plea of not, guilty. Subsequently, he amended his plea to assert that he was not guilty by *Page 1026 
reason of mental disease or defect. The trial court ordered an evaluation to determine whether the appellant was suffering from a mental disease or defect at the time of the offense; whether the symptoms of any disease or defect contributed to the commission of the offense, and, if so, in what manner; whether the appellant was capable of assisting in his own defense; and whether he was competent to stand trial. Dr. Michael D'Errico, a forensic psychologist and certified forensic examiner for the State of Alabama, examined the appellant pursuant to the trial court's order and found the appellant to be competent to stand trial.
D'Errico met with the appellant for one to two hours on June 5, 1997, interviewing him and administering a psychological test. D'Errico also reviewed reports by law enforcement officers, Paulk's report, statements of several witnesses, and a statement the appellant made to deputies about the offenses. Finally, D'Errico reviewed records pertaining to prior psychological treatment provided to the appellant, including treatment he received during 1992 and 1993 at the Methodist Children's Home of Ruston, Louisiana, and he conducted a telephone interview with the appellant's step-mother, who "had been partially responsible for [his] upbringing since he was age five." Based on his evaluation of the appellant, D'Errico testified as follows:
 "At the time I did my evaluation, I thought there was a possibility that Mr. Dunaway was experiencing symptoms of anxiety and possibly depression. But, overall, I didn't have enough information to make a clear diagnosis of a severe mental illness.
 ". . . At the time I did my evaluation, I felt that Mr. Dunaway did not meet the usual criteria for what we call severe mental disease or defect." (R. 410-11.)
Dr. Fernando Lopez, a psychiatrist, evaluated the appellant for the defense. be first talked to the appellant on September 5, 1997, and subsequently talked to him on three other occasions. His evaluation included interviewing, psychological testing, and reviewing records relating to prior treatment. Lopez testified, in part, as follows:
 "Q. Based on your evaluations; can you give us and the jury some idea of how Larry reacted to certain questions or stimuli or whatever?
 "A. We interviewed the young man and tested him, and we reviewed some previous information we had from Louisiana, mostly, and interactions with other psychiatrists and counselors, and also reviewed forensic examinations by my colleagues, and my observations indicated that this man is suffering from mental illness.
 "Q. Okay. And at the current time you feel he is suffering from mental illness?
 "A. This has been going on gradually for the past several years, and is coming to develop one of these days into an illness.
 "The illness I'm talking about is schizophrenia. This is an illness of young adults, mostly males, between 15 and 25 years of age. And half the women but later, 25 to 35 years of age. And it is incipient, it is gradual. It doesn't happen overnight. It evolves gradually. And finally, these people come to the courts usually for behavior they have done, and they are displayed acting these thoughts that they have, misperception — misconceptions, and usually work with sending them to state hospitals with psychiatric units to be treated."
(R. 550-51.) He stated that, in his opinion, the appellant was "undergoing this psychiatric disorder" at the time of the murders. (R. 553.) be further testified, "I believe that he is suffering from a mental illness and, as such, his behavior, although he knows the difference between right and wrong, at the time of the incident, he could not perceive the wrongfulness of his acts." *Page 1027 
(R. 556.) On cross-examination, he stated that the appellant knew right from wrong but was not himself while he was committing the murders. (R. 566.) He noted:
 "[H]e can formulate things, but the will, the action, the volition we call it, is impaired in doing the thinking. At that moment, you can claim that he was under the influence of the irresistible impulse and he had to justify it cognitively, you know."
(R. 567.) He stated that the appellant perceived Tressa's threatening to end their relationship as an attack or threat to him, and that his mental condition caused him to react as he did. Therefore, Lopez concluded that the appellant was reacting to feeling threatened and had no control over his reaction.
Lopez also testified that the appellant stated that he accidentally shot Tressa Patterson and then went into the woods. He told Lopez that he started hearing voices telling him to "Send them to hell," and that he went back and set the mobile home on fire. (R. 565.) However, Lopez stated that the appellant told him that he did not hear voices until after he shot Tressa Patterson and concealed the rifle. Lopez testified that his review of records of the appellant's psychological treatment in 1992 and 1993 indicated that the appellant claimed that he heard voices at the time. Lopez admitted, however, that the appellant was experiencing some legal problems at that time and that he seemed to hear these "voices" only when he was in legal trouble.
The appellant raises issues on appeal that he did not raise at trial. The lack of an objection at trial will not bar our review of an issue in a case involving the death penalty, but it will weigh against any claim of prejudice. Exparte Kennedy, 472 So.2d 1106 (Ala.), cert. denied,474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985). Thus, with respect to the appellant's conviction for the murder of James Patterson, we have reviewed the record for any error, whether plain or preserved. See Rule 45A, Ala, R.App. P. Rule 45A provides:
 "In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review . . . whenever such error has or probably has adversely affected the substantial right of the appellant."
"[This] plain-error exception to the contemporaneous-objection rule is to be `used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.'"United States v. Young, 470 U.S. 1, 15,105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting United Statesv. Frady, 456 U.S. 152, 163, 102 S.Ct. 1584,1592, 71 L.Ed.2d 816 n. 14 (1982)).
Because the trial court sentenced the appellant to life imprisonment without the possibility of parole for the murder of Tressa Patterson, we have not reviewed that conviction for plain error. Ex parte Woodall, 730 So.2d 652 (Ala. 1998);Ex parte Price, 725 So.2d 1063 (Ala. 1998). InWoodall, the Alabama Supreme Court explained as follows:
 "Because the defendant in this case was sentenced to death, we have complied with our obligation under Rule 39 (k) and conducted a plain-error review. However, with respect to his attempted murder conviction, for which he received a sentence of less than death, we do not believe the defendant is entitled to benefit from our plain-error review. We have found no Alabama decision dealing with the particular situation present here: a case in which plain error necessitated a reversal on a capital conviction and death sentence but in which the defendant was also sentenced to a term of imprisonment on another conviction. However, the defendant's sentence of imprisonment for his conviction of attempted murder does not implicate the same heightened degree of concern for reliability that attended his sentence of death for the capital conviction, It is well established that where a *Page 1028 
defendant receives only a prison sentence the plain-error doctrine is not applicable and an appellate court will not consider an alleged error that the defendant failed to preserve by making a proper and timely objection in the trial court. See Biddle v. State, 516 So.2d 846 (Ala. 1987); Harris v. State, 347 So.2d 1363 (Ala.Cr.App. 1977), cert. denied, 347 So.2d 1363 (Ala. 1978). Indeed, it has been said that the plain-error doctrine `applies to death penalty cases, but not to other convictions.' Pugh v. State, 355 So.2d 386, 389 (Ala.Cr.App.), cert. denied, 355 So.2d 392 (Ala. 1977) (citations omitted) (emphasis added).
 "Had the defendant been convicted and sentenced to a term of imprisonment on the attempted murder count but either acquitted or sentenced to life imprisonment without the possibility of parole on the capital murder count, the plain-error doctrine would not have applied. Thus, we would not have even considered the error upon which we have predicated our reversal of his capital conviction and death sentence: the State's questioning of the defendant regarding his character and the subsequent introduction of evidence of specific incidents tending to indicate a propensity for violence. No objection to that questioning was raised at trial. The defendant should not be put in a more favorable position with respect to our review of his noncapital conviction simply because he was also found guilty of a capital offense and was sentenced to death. Thus, we conclude that the defendant's failure to object to the State's inquiry into his character or to the introduction of evidence of the three violent incidents precludes this Court from considering those grounds as the foundation for a reversal of his attempted-murder conviction, for which he received a sentence of less than death."
Woodall, supra at 665. Based on this reasoning, we have reviewed the appellant's conviction for the death of Tressa Patterson only for preserved error and his conviction for the death of James Patterson for any error, whether plain or preserved.
 I.
The appellant argues that the evidence of his insanity at the time of the murders was "overwhelming and uncontradicted" and was sufficient to overcome the presumption of his sanity. Therefore, he contends that the trial court should have granted his motion for a judgment of acquittal.
With respect to the insanity defense, § 13A-3-1, Ala. Code 1975, provides as follows:
 "(a) It is an affirmative defense to a prosecution for any crime that, at the time of the commission of the acts constituting the offense, the defendant, as a result of severe mental disease or defect, was unable to appreciate the nature and quality or wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.
 "(b) `Severe mental disease or defect' does not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.
 "(c) The defendant has the burden of proving the defense of insanity by clear and convincing evidence."
We have explained the insanity defense as follows:
 "In Ware v. State, 584 So.2d 939
(Ala.Cr.App. 1991), this Court observed:
 "`In 1988, the Alabama legislature replaced our insanity defense statute by enacting the "Reasonable Insanity Test Act of 1988," 1988 Ala. Acts 1051, No. 88-654, now codified at Ala. Code § 13A-3-1 (Supp. 199O). Subsection (a) of that statute provides that:
 "`"It is an affirmative defense to a prosecution for any crime that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to *Page 1029 
appreciate the nature and quality or wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense."
 "`Section 13A-3-1 (a) is virtually identical to the federal insanity defense statute, 18 U.S.C. § 17
(a) (1988), which "was passed in the wake of John Hinckley's acquittal of charges arising from his actions in shooting President Ronald Reagan and Press Secretary James Brady." United States v. Cameron, 907 F.2d 1051, 1061 (11th Cir. 1990).
 "`The new Alabama and federal insanity statutes represent a significant change from the insanity defenses previously available in criminal trials. Formerly, a defendant was not responsible for his criminal acts if "at the time of such conduct as a result of mental disease or defect he lack[ed] substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." Ala. Code § 13A-3-1(a) (1982 Replacement Vol.); United States v. Freeman, 357 F.2d 606, 622 (2d Cir. 1966). It is clear that the new § 13A-3-1
(a) is "substantially more restrictive" than its predecessor section. United States v. Brown, 899 F.2d 189, 192 (2d Cir. 1990) (comparing 18 U.S.C. § 17 (a) to the predecessor defense recognized in federal courts). Where the original § 13A-3-1 (a) had both a "cognitive" test (lack of capacity to appreciate the criminality of the conduct) and a "volitional" test (lack of capacity to conform one's conduct to the requirements of the law), the new § 13A-3-1
(a) has only a "cognitive" test (inability to appreciate the nature and quality or wrongfulness of one's acts). See United States v. Brown, 899 F.2d at 192; United States v. Cameron, 907 F.2d at 1061.
 "`While the new § 13A-3-1 (a) contains only the "cognitive" test, the defendant must make a two-part showing to meet this test. "First, he must establish that he suffered from a serious mental disease or defect at the time of the crime. Second, his mental disease or defect must have prevented him from appreciating the nature and quality or wrongfulness of his acts." United States v. Knott, 894 F.2d 1119, 1121 (9th Cir.), cert. denied, 498 U.S. 873, 111 S.Ct. 197, 112 L.Ed.2d 158
(1990) (citations omitted) (emphasis added). The defendant must prove both prongs of this test "by clear and convincing evidence." § 13A-3-1(c) (Supp. 1990).
 "`While new § 13A-3-1 (a) contains a much more restrictive definition of insanity than that under which we previously operated, the general principles of law regarding the defense of insanity remain unchanged. Those principles have been summarized as follows:
 "`"1. By statute, there is a presumption of sanity extending to all persons over the age of 14.
 "`"2. The defense of insanity is an affirmative defense. The burden of proving this defense rests upon the defendant and never shifts to the state.
 "`"3. The burden upon the defendant is to establish the issue of legal insanity by a preponderance of the evidence and to the reasonable satisfaction of the jury.
 "`"4. The question of insanity at the time of the commission of the crime is a matter to be determined by the jury from a consideration of all the evidence.
 "`"5. In making its determination, the jury may reject all expert testimony though it is without conflict.
 "`"6. However, opinion testimony, even of experts, must be weighed by the jury and may not be arbitrarily ignored.
"`". . . . *Page 1030 
 "`"The one exception to these rules is found in those cases where the proof of insanity is overwhelming and uncontradicted.
 "`"`Cases, of insanity may be so clear, the proof so strong and undisputed, that the jury should be instructed in like form.' Boyle v. State, 229 Ala. 212, 222, 154 So. 575, 583 (1934)."
 "`Herbert v. State, 357 So.2d 683, 688-89
(Ala.Cr.App.), cert. denied, 357 So.2d 690 (Ala. 1978). See also Christian v. State, 351 So.2d 623, 624-25
(Ala. 1977); Ellis v. State, 570 So.2d 744, 749-753 (Ala.Cr.App. 1990).'
"`. . . .
 "`"In order for this court to reverse [a guilty verdict on the ground that it is contrary to the weight of the evidence of insanity, the] evidence of insanity must be `overwhelming,' `uncontradicted,' and `clear, . . . strong and undisputed.'" Sistrunk v. State, 455 So.2d 287, 289
(Ala.Cr.App. 1984) (citations omitted). As noted above, this evidence must establish that, at the time the offense was committed, (1) the defendant was suffering from a severe mental disease or defect and (2) that this disease or defect resulted in the defendant's inability to appreciate the nature and quality or wrongfulness of his actions. § 13A-3-i(a) (Supp. 199O).'
"584 So.2d at 942-45 (emphasis in original).
". . . .
 "`Although the presumption of sanity can be overcome or rebutted, the accused is not entitled to a directed verdict on the issue of insanity unless the evidence of insanity is clear, strong and undisputed. Boyle v. State, 229 Ala. 212, 222, 154 So. 575 (1984).
 "`"But courts should be careful not to invade the province of the jury in cases of this character. Although the evidence may be offered only by the defense, and all tend to one conclusion, yet, in view of the presumption of sanity, if the evidence is inconclusive, and reasonable inferences may be drawn that the act was that of a sane man as defined by law, the affirmative charge should be refused." Boyle, 229 Ala. at 222, 154 So. 575.
 "`When the accused has offered evidence sufficient to overcome the presumption of sanity, the State is not required to prove his sanity. Howard v. State, 172 Ala. 402, 408, 55 So. 255 (1911). Insanity is an affirmative defense which must be proven by the defendant to the reasonable satisfaction of the jury. The burden of proving insanity never shifts to the State but remains on the defendant throughout the trial. Grammer v. State, 239 Ala. 633, 196 So. 268 (1940). "[A] reasonable doubt of sanity, raised by all the evidence, does not authorize an acquittal." Boswell [v. State], 63 Ala. [307, 326 (1879)]. "It would be an anomaly to require the State to prove a fact which the law presumes to exist, and to authorize such fact to be overturned by the injection into the case of a reasonable doubt of its existence. Such is not the law." Maxwell v. State, 89 Ala. 150, 164, 7 So. 824 (1890). "Thus, where the whole evidence does not satisfy the minds of the jury that the accused is insane at the time of the commission of the crime with which he is charged, the jury should convict the defendant, notwithstanding that the medical witnesses were of the opinion that such person was insane." 31 Am.Jur.2d Expert And Opinion Evidence Section 186 (1967).'
 "Cunningham v. State, 426 So.2d 484, 486, 490 (Ala.Cr.App. 1982).
 "The question presented here is one of the sufficiency of the evidence, although *Page 1031 
the appellant would have this Court reweigh the evidence. Even in this case where there is considerable evidence of insanity, this Court will not reweigh the evidence. Ellis v. State, 570 So.2d 744, 755-756 (Ala.Cr.App. 1990). `Even though an appellate court should "marvel that a jury would convict upon such flimsy proof," it is "not permitted to pass upon the weight or sufficiency of the evidence, where it may yield any rational inference of guilt."' Granger v. State, 473 So.2d 1137, 1139 (Ala.Cr.App. 1985).
 "`We hesitate to take from the jury any case where there is evidence of conscious guilt at the moment the deed was perpetrated. . . . In such case, it is for the jury to say whether [the defendant's diseased mind] was the sole cause of the deed.'
 "Boyle v. State, 229 Ala. 212, 224, 154 So. 575, 586 (1934).
 "In this case, the appellant's actions and conduct immediately after the shooting-his statements acknowledging responsibility for the shootings and his request for an attorney — are indications of sanity. `[C]almness, indifference to results, consciousness of the moral or legal criminality of the act, with connectedness in the employment of the reasoning faculty, while not conclusive evidence of sufficient sanity to justify criminal punishment, are nevertheless strong circumstances tending to prove legal accountability.' Boswell v. State, 63 Ala. 307, 320 (1879). The mere arbitrariness and depravity of the shooting in this case tends to indicate that the appellant must have been insane. However, that in itself is not a legal basis for a directed verdict. Ellis, 570 So.2d at 753.
 "Here, there was evidence to indicate that the appellant was able `to appreciate the nature and quality or wrongfulness of his acts.' § 13A-3-1 (a). However, while there was substantial evidence that the appellant was psychotic at the time of the shootings, there was not overwhelming and uncontradicted, clear, and strong evidence that the appellant was unable to appreciate the nature and quality or wrongfulness of his actions. Without reweighing the evidence and substituting our opinion for that of the jury, this Court cannot reverse the appellant's conviction on the ground of proof of insanity."
Bass v. State, 585 So.2d 225, 232-36
(Ala.Cr.App. 1991), overruled in part, Trawick v. State,698 So.2d 151 (Ala.Cr.App. 1995) (overruling Bass to the extent that it implied that the burden of proving an insanity defense was by a "preponderance of the evidence" rather than by "clear and convincing evidence").
In determining whether the mitigating circumstance that the capital offense was committed while the appellant was under the influence of extreme mental or emotional disturbance existed, the trial court found as follows:
 "Does not exist. The defendant's psychiatric history, detailed at trial through the pleas of not guilty by reason of severe mental disease or defect, does not suggest that his offense against James Patterson, committed in January 1997, occurred during a period that the defendant was under the influence of extreme mental or emotional disturbance. In January 1997, and before, defendant was holding down a job, his boss testifying that defendant was lucid and normal."
(C.R.122.) In evaluating whether to apply the mitigating circumstance that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired, the trial court found as follows:
 "Does not apply. Dr. D'Errico's findings, and other evidence produced at trial, fail to show that the defendant did not appreciate the criminality or wrongfulness of his actions or that his capacity to conform his conduct to the requirements *Page 1032 
of the law was substantially impaired."
(C.R.123.)
The appellant's actions before, during, and after the murders, including his flight from the scene, indicated a consciousness of guilt and an awareness of the wrongfulness of his actions.Sistrunk v. State, 455 So.2d 287
(Ala.Cr.App. 1984); Cunningham v. State, 426 So.2d 484
(Ala.Cr.App. 1982). As we noted in Cunningham:
 "The very manner in which the crime was planned, executed or concealed may indicate such a consciousness of guilt and awareness of criminality that the question of sanity was for the jury even though all the expert defense testimony concluded that the defendant was insane.
". . . .
 "Despite the strength and impressive nature of their testimony, there were also facts which authorized the reasonable inference that the defendant was sane. The victim was stabbed once in the back. Almost immediately after the stabbing the defendant `took off' and tried to flee when he spotted the police `Hiding or attempting escape has been admitted as evidence of sufficient sanity to be conscious of guilt.' [H.] Weihofen [Mental Disorders as a Criminal Defense,] at 315 [(1954)]. `Flight from justice, and its analogous conduct, have always been deemed indicative of a consciousness of guilt.' 2 Wigmore, Evidence Section 276 (4) (Chadbourn rev. 1979). Ordinarily, the issue of insanity is for the jury where the evidence discloses `conscious guilt' at the moment of the crime. Boyle, 229 Ala. at 224, 154 So. 575."
". . . .
 "The defendant's conduct and demeanor immediately after the crime provided a reasonable inference of sanity. Although the experts testified that this conduct was not inconsistent with insanity, whether it was consistent or inconsistent presented a question for the jury. `(C)almness, indifference to results, consciousness of the moral or legal criminality of the act, with connectedness in the employment of the reasoning faculty, while not conclusive evidence of sufficient sanity to justify criminal punishment, are nevertheless strong circumstances tending to prove legal accountability.' Boswell, 63 Ala. 307, 320, 35 Am.Rep. 20 (1879)."
426 So.2d at 490-91. The manner in which the appellant set the fire indicated he was trying to conceal the killing of Tressa Patterson. He admitted using alcohol as an accelerant, and experts testified that alcohol is difficult to detect in arson investigations. Thereafter, he concealed the rifle he used to shoot Tressa Patterson. After the fire was discovered, he told inconsistent stories about where he was and what he was doing immediately before the fire. Also, he made inconsistent statements or asked inconsistent questions about where Tressa and James Patterson were before and during the fire. Finally, at times following the fire, he reacted almost with indifference toward the consequences of the fire.
The jury could also have found that the appellant's motive was jealousy. Sistrunk v. State, 455 So.2d 287
(Ala.Cr.App. 1984). The appellant testified that he and Tressa had been having problems in their relationship, that she had asked him to move out, and that she had thrown his clothes out of the mobile home shortly before the murders. Also, Lois Russaw testified that the appellant was "real jealous" and that, shortly before the murders, he had twice threatened to kill Tressa. She indicated that, on the New Year's Eve preceding the murders, the appellant told Tressa, "Don't you know I'll blow a hole through you and stand back and look at you?" Russaw said the appellant also told Tressa he would blow her head off so nobody would identify her body. She also testified that, about a month before he made the New Year's Eve threat, the appellant threatened to kill *Page 1033 
Tressa, who was black, and Lee, a white man Tressa "was trying to go with." (R. 472-74.) Jonathan Antonio Daniels testified that, in late December of 1996, the appellant became mad because Lee went home with Tressa. be stated that the appellant threatened to kill Tressa, telling her, "I'll kill you before I'll let somebody else have you." (R. 502.)
There was conflicting expert testimony concerning the appellant's sanity at the time of the murders.
 "`Opinions of experts in the field of mental disorders as to an accused's sanity or insanity are of course admissible and certainly should be carefully considered by a jury. Such opinion evidence is not, however, conclusive on the jury. The responsibility is upon the jury to weigh all the evidence, expert and lay, pertaining to the issue of the accused's mental competency. The weight to be accorded all such evidence is solely within the jury's province. They may reject it all even though it is without conflict.'
 "Fitzhugh v. State, 35 Ala. App. 18, 26, 43 So.2d 831, 838, cert. denied, 253 Ala. 246, 43 So.2d 839 (1949), cert. denied, 339 U.S. 986, 70 S.Ct. 1007, 94 L.Ed. 1388 (1950). . . .
". . . .
 "`Expert testimony, even when uncontradicted, is not conclusive on the issue of sanity, . . . and the jury may find such testimony adequately rebutted by the observations of mere laymen." [United States v.] Mota, 598 F.2d [995] at 999 [(5th Cir. 1979)]. See also Greider v. Duckworth, 701 F.2d 1228, 1234 (7th Cir. 1983) (`The jury could credit the testimony of lay witnesses over that of an expert witness'); United States v. Emery, 682 F.2d 493, 498 n. 3 (5th Cir.), cert. denied, 459 U.S. 1044, 103 S.Ct. 465, 74 L.Ed.2d 615 (1982) (`The jury can find expert testimony adequately rebutted by the observations of laymen').
". . . .
 "Although `a factfinder need not adhere to an expert opinion on incompetency if there is reason to discount it,' Strickland v. Francis, 738 F.2d 1542, 1552 (11th Cir. 1984), `the jury cannot arbitrarily ignore the experts in favor of the observations of laymen,' id., and must have an `objective reason,' to disregard the expert's opinion which is rebutted only by lay testimony. Wallace v. Kemp, 757 F.2d 1102, 1109 (11th Cir. 1985).
 "`In making this judgment [to disregard the expert's opinion], the court should consider
 "(1) the correctness or adequacy of the factual assumptions on which the expert opinions are based;
 "(2) possible bias in the experts' appraisal of the defendant's condition;
 "(3) inconsistencies in the experts' testimony, or material variations between experts; and
"(4) the relevance and strength of the contrary lay testimony.
 "Strickland, 738 F.2d at 1552; Brock [v. United States,] 387 F.2d [254, 258 (5th Cir. 1967)] (quoting Mims v. United States, 375 F.2d 135, 143-44 (5th Cir. 1967)).'
"Wallace v. Kemp, 757 F.2d at 1109."
Ellis v. State, 570 So.2d 744, 751-53
(Ala.Cr.App. 1990).
In addition to the expert testimony, there was also lay testimony about the appellant's sanity.
 "Testimony from both the state's and the defendant's lay witnesses, however, produced ample evidence from which the jury could have inferred sanity despite the expert testimony. See Bullard v. State, 408 So.2d 164, 167 (Ala.Crim.App.), cert. denied, 408 So.2d 167 (Ala. 1982)."
Sistrunk v. State, 455 So.2d 287, 289
(Ala.Cr.App. 1984). Several people who knew the appellant testified that he appeared to them to be normal and that he never acted in such a way as to lead them to believe he *Page 1034 
had mental problems. None of them had seen the appellant acting in an unusual manner. Don Dykes, for whom the appellant sometimes worked, indicated that the appellant could follow instructions without any difficulty and that he seemed to have good sense.
 "Finally, in this case there was additional evidence which was not presented in any of the preceding cases which overturned similar convictions. Appellant took the witness stand and testified as to his own state of mind at the time of the crime. His demeanor and manner of testifying constituted evidence which was proper for the jury to consider in reaching their decision. `The conduct of a witness on the stand is, of course, a form of testimony; his demeanor is always in evidence when he testifies.' Stewart v. United States, 366 U.S. 1, 6, 13, 81 S.Ct. 941, 6 L.Ed.2d 84 (1961). Appellant's state of mind at the time of trial demonstrated primarily his capacity to stand trial. The jury could also decide whether or not they believed he was telling the truth about his intent at the time he stabbed his niece."
Sistrunk v. State, 455 So.2d 287, 290
(Ala.Cr.App. 1984).
The appellant did not present sufficient evidence of insanity to overcome the presumption that he was sane at the time of the commission of the murders. Although he presented some evidence that created doubt about his mental state at the time of the murders, there was not overwhelming and uncontradicted evidence that he was insane at the time of the murders. In fact, there was evidence that indicated that the appellant was able "to appreciate the nature and quality or wrongfulness of his acts." § 13A-3-1
(a), Ala. Code 1975. Based on the conflicting expert testimony concerning the appellant's sanity, testimony of lay witnesses that the appellant appeared to be sane, and the appellant's testimony and demeanor at trial, the jury could have reasonably concluded that the appellant was sane at the time of the murders. Accordingly, we will not disturb the jury's verdict.
 II.
The appellant also contends that the trial court erred in refusing to give four of his requested jury instructions on lesser included offenses. With regard to charging on lesser included offenses, §13A-1-9 (b), Ala. Code 1975, provides: "The court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense." In Boyd v. State, 699 So.2d 967
(Ala.Cr.App. 1997), we explained:
 "`A defendant accused of a greater offense is entitled to have the trial court charge on any lesser included offense if there is any reasonable theory from the evidence to support the lesser charge, regardless of whether the state or the defendant offers the evidence. Ex parte Pruitt, 457 So.2d 456
(Ala. 1984); Parker v. State, 581 So.2d 1211
(Ala.Cr.App. 1990), cert. denied, 581 So.2d 1216 (Ala. 1991). A court may properly refuse to charge on a lesser included offense . . . when . . . it is clear to the judicial mind that there is no evidence tending to bring the offense within the definition of the lesser offense. . . . Anderson v. State, 507 So.2d 580
(Ala.Cr.App. 1987). . .
699 So.2d at 972.
 A.
First, the appellant argues that, in the case of the murder of James Patterson, the trial court should have instructed the jury on reckless murder. A person commits the offense of reckless murder if, "[u]nder circumstances manifesting extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to a person other than himself, and thereby causes the death of another person." § 13A-6-2 (a)(2), Ala. Code 1975. A charge on reckless murder is not appropriate where the acts resulting *Page 1035 
in death are directed toward one or more particular people, as was the case here, rather than toward human life in general. Parkerv. State, 587 So.2d 1072 (Ala, Cr. App. 1991);McLaughlin v. State, 586 So.2d 267
(Ala.Cr.App. 1991); Walker v. State, 523 So.2d 528
(Ala.Cr.App. 1988); Ex parte McCormack, 431 So.2d 1340
(Ala. 1983); Northington v. State, 413 So.2d 1169
(Ala.Cr.App. 1981), writ quashed, 413 So.2d 1172 (Ala. 1982). In Northington, we held:
 "The evidence in this case, even when viewed in the light most favorable to the prosecution, reveals that the defendant's acts and omissions were specifically directed at a particular victim and no other.
 "The State presented no evidence that the defendant engaged in conduct `under circumstances manifesting extreme indifference to human life' for, while the defendant's conduct did indeed evidence an extreme indifference to the life of her child, there was nothing to show that the conduct displayed an extreme indifference to human life generally. Although the defendant's conduct created a grave risk of death to another and thereby caused the death of that person, the acts of the defendant were aimed at the particular victim and, no other. Not only did the defendant's conduct create a grave risk of death to only her daughter and no other, but the defendant's actions (or inactions) were directed specifically against the young infant. F. Wharton, The Law of Homicide (3rd ed. 1907) at Section 129. This evidence does not support a conviction of murder as charged under Section 13A-6-2 (a)(2)."
413 So.2d at 1171-72.
From the evidence presented at trial, there was no reasonable theory that would have supported a finding that the appellant's actions displayed an extreme indifference to human life in general. He clearly directed his actions toward Tressa and James Patterson. Therefore, the trial court properly denied the appellant's request for a charge on the lesser included offense of reckless murder with respect to the murder of James Patterson.
 B.
The appellant contends that, in the case of the killing of James Patterson, the trial court should have charged the jury on the lesser included offense of reckless manslaughter. "A person commits the crime of manslaughter if he recklessly causes the death of another person." § 13A-6-3 (a)(1), Ala. Code 1975. InBarnett v. State, 540 So.2d 810 (Ala.Cr.App. 1988), we stated the following concerning charging on reckless manslaughter when an insanity defense is asserted:
 "Barnett does argue that the jury should have been charged on `reckless' manslaughter, because the evidence of his mental disease or defect at the time of the offense rendered him incapable of forming the intent necessary for murder. He analogizes the psychiatric testimony presented here to evidence of intoxication: although `[i]ntoxication is not a defense to a criminal charge, . . . intoxication is admissible in evidence whenever it is relevant to negate an element of the offense charged.' § 13A-3-2
(a). Cf. § 13A-2-6 (a)(1) (A mistake of fact is not a defense to a criminal charge unless the factual mistake negatives the culpable mental state required for the commission of an offense), and 13A-2-6 (d) (`A mistake of law, other than as to the existence or meaning of the statute under which the defendant is prosecuted, is relevant to disprove the specific state of mental culpability required by the statute under which the defendant is prosecuted.').
 "Barnett argues that the issue of his mental state should have been submitted to the jury under instructions that it could negate the intent requirement for murder, thereby reducing the killing to manslaughter. This contention embodies the concept of `diminished capacity' or `diminished responsibility,' and was specifically rejected by the draftsmen of *Page 1036 
our criminal code. See Ala. Code § 13A-6-3
(Commentary at 158):
 "`Under § 13A-6-3 (a)(2), it was originally proposed to replace the "heat of passion" due to provocation criterion with "extreme mental or emotional disturbance," . . . which approach is being adopted by many modern criminal codes. . . . This standard originated in the Model Penal Code § 210.3 and is discussed in Commentary, (Tent. Draft No. 9) pp. 28-29.
 "`However, some numbers of the Advisory Committee considered the proposal unsound, unclear and susceptible of abuse, so it was not adopted, and § 13A-6-3 (a)(2) retains the "heat of passion" under legal provocation defense.' § 13A-6-3 Commentary (emphasis added [in Burnett]).
 "See also Neelley v. State, 494 So.2d 669, 682 (Ala.Cr.App. 1985), affirmed, Ex parte Neelley, 494 So.2d 697 (Ala. 1986) cert. denied, Neelley v. Alabama, 480 U.S. 926, 107 S.Ct. 1389, 94 L.Ed.2d 702 (1987); Hill v. State, 507 So.2d 554, 556 (Ala.Cr.App. 1986), cert. denied, Ex parte Hill, 507 So.2d 558
(Ala. 1987).
 "Although Alabama adopted the criterion for insanity contained in § 4.01 of the Model Penal Code, it did not adopt the accompanying section of the Model Penal Code, § 4.02 (1), which provided that `[e]vidence that the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove that the defendant did or did not have a state of mind which is an element of the offense.' Compare Model Penal Code § 4.02 (A.L.I. 1980) with Ala. Code § 13A-3-1 (1975). See § 13A-3-1 Commentary.
 "`The rule applied in this jurisdiction is sometimes referred to as the "all-or-nothing" approach.' Hill, 507 So.2d at 556. Under this approach, a `defendant must either establish his insanity as a complete defense to or excuse for the crime, or he must be held to full responsibility for the crime charged.' Annot., 22 A.L.R.3d 1228, § 4 at 1236 (1968). "Accordingly, Barnett was not entitled to a charge on reckless manslaughter on the theory of diminished mental capacity."
540 So.2d at 811-12. In Hill v. State, which Barnett cites, we explained:
 "The trial court charged the jury on `heat of passion' manslaughter pursuant to subsection (a)(2), but denied the appellant's request to charge the jury on `reckless' manslaughter under subsection (a)(1). Reckless manslaughter is a lesser included offense of intentional murder, the crime for which appellant was indicted. Paige v. State, 494 So.2d 795 (Ala.Cr.App. 1986); Ex parte Weems, 463 So.2d 170 (Ala. 1984). This contention seems to be based on the `diminished capacity doctrine.'
 "`The diminished-capacity doctrine recognizes that although an accused was not suffering from a mental disease or defect when the offense was committed sufficient to exonerate him of all criminal responsibility, his mental capacity may have been diminished by intoxication, trauma, or mental disease so that he did not possess the specific mental state or intent essential to the particular offense charged. A defendant claiming diminished capacity concedes his responsibility for the act but claims that, in light of his abnormal mental condition, he is less culpable.'
 "State v. Thompson, 695 S.W.2d 154 (Mo.App. 1985) (quoting State v. Correra, 430 A.2d 1251, 1253 (R.I. 1981)). Alabama has expressly rejected the diminished capacity doctrine. Neelley v. State, 494 So.2d 669
(Ala.Cr.App. 1985).
 "The rule applied in this jurisdiction is sometimes referred to as the `all-or-nothing' approach. Comment, Diminished Capacity — Recent Decisions and an Analytical Approach, 30 Vand. L.Rev. 213 (1977). That is, under our *Page 1037 
statutes a defendant is either sane or he is not. Thus, a charge on a lesser included offense predicated on mental capacity should not be given when the evidence suggests that the defendant has a diminished mental capacity, but is not insane as defined in § 13A-3-1, Code of Alabama 1975.
 "If the jury in the present case had found that appellant bill was suffering from a mental disease or defect at the time she shot the decedent and that that disease or defect produced the act, then she could be found not guilty by reason of mental defect. In that event, a charge on the lesser included offense would not be needed. If, on the other hand, she was found to be sane at the time of the murder, a lesser included offense charge on reckless manslaughter should be given only if the facts of the particular case-facts unrelated to any diminished mental capacity-would warrant the giving of such a charge. In Ex parte Weems, supra, the Alabama Supreme Court observed that `the degree of recklessness which will support a manslaughter conviction involves a circumstance which is a "gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation," but is not so high that it cannot be "fairly distinguished from" the mental state required in intentional homicides.' Ex parte Weems, 463 So.2d at 172. Here, the appellant admitted taking the gun from a dresser drawer, pointing it at the head of the decedent and shooting him in the head repeatedly. Her actions were not consistent with a finding of recklessness. Since there was no evidence in the present case that would support an instruction on reckless manslaughter, the trial court did not err in denying the appellant's charge."
507 So.2d at 556-57. Finally, we note that, although evidence of an extreme emotional or mental disturbance is relevant to an insanity defense, it does not reduce murder to manslaughter. Corbin v. State,551 So.2d 429 (Ala.Cr.App. 1989); Gray v. State,482 So.2d 1318 (Ala.Cr.App. 1985).
Apart from the evidence relating to the appellant's insanity defense, there was no evidence that the appellant acted recklessly in killing James Patterson. In fact, the evidence showed that the appellant intentionally set the fire and left James Patterson in the burning mobile home to die. His acts were inconsistent with a finding of recklessness. Based on the evidence presented at trial, there was no rational basis for a finding that the appellant acted recklessly in killing James Patterson. Therefore, the trial court correctly denied the appellant's request for a charge on reckless manslaughter with regard to the killing of James Patterson.
 C.
The appellant contends that, in both. cases, the trial court should have instructed the jury on the lesser included offense of felony murder. § 13A-6-2(a)(3), Ala. Code 1975. A person commits the crime of felony murder if:
 "He commits or attempts to commit arson in the first degree, burglary in the first or second degree, escape in the first degree, kidnapping in the first degree, rape in the first degree, robbery in any degree, sodomy in the first degree or any other felony clearly dangerous to human life and, in the course of and in furtherance of the crime that he is committing or attempting to commit, or in immediate flight therefrom, he, or another participant if there be any, causes the death of any person."
§ 13A-6-2 (a)(3), Ala. Code 1975. The offense of felony murder involves an intended felony and an unintended homicide.Williams v. State, 601 So.2d 1062 (Ala.Cr.App. 1991), aff'd, 662 So.2d 929 (Ala.), cert, denied,506 U.S. 957, 113 S.Ct. 417, 121 L.Ed.2d 340 (1992);Ex parte Bates, 461 So.2d 5 (Ala. 1984); Johnsonv. State, 620 So.2d 679 (Ala.Cr.App. 1992), rev'd on other grounds, 620 So.2d 709 (Ala. 1993). *Page 1038 
 "`"[T]he purpose of the felony-murder doctrine is to hold felons accountable for unintended deaths caused by their dangerous conduct." W. LaFave and A. Scott, 2 Substantive Criminal Law § 7.5 at 210 (1986). See Ex parte Ritter, 375 So.2d 270, 273-74 (Ala. 1979), vacated on other grounds, 448 U.S. 903, 100 S.Ct. 3044, 65 L.Ed.2d 1133 (1980); Ex parte Bates, 461 So.2d 5, 7 (Ala. 1984). Here, the evidence shows that the defendant intentionally killed his wife. There is no rational basis for a verdict convicting him of felony-murder. § 13A-1-9
(b)."
Williams v. State, 601 So.2d at 1075 (quoting White v. State,587 So.2d 1218, 1231 (Ala.Cr.App. 1990)).
Under the facts presented, there was no rational basis for a finding that the appellant unintentionally killed Tressa Patterson while intentionally committing one of the felonies listed in §13A-6-2 (a)(3), Ala. Code 1975. In that case, the evidence showed that one of three things occurred: 1) he intentionally killed her by shooting her, 2) he suffered from a mental disease or defect when he killed her, or 3) he accidentally shot and killed her. Even though the jury could have found that the appellant accidentally killed Tressa Patterson, there was no evidence that he was intentionally committing one of the felonies listed in §13A-6-2 (a)(3) when he killed her. Thus, the trial court properly refused to give his requested charge on felony murder with regard to the murder of Tressa Patterson.
Likewise, there was no rational basis for a charge on felony murder with respect to the killing of James Patterson. In that case, the evidence indicated that one of two things occurred: 1) he intentionally killed James Patterson, a 22-month-old child, by intentionally leaving him in the burning mobile home or 2) he suffered from a mental disease or defect when he killed him. There was absolutely no evidence in that case that the appellant unintentionally killed James Patterson while intentionally committing one of the felonies listed in §13A-6-2-(a)(3), Ala. Code 1975. Therefore, the trial court properly denied the appellant's request for an instruction on felony murder with regard to the murder of James Patterson.
 III.
Finally, the appellant raises several arguments concerning the trial court's findings as to mitigating and aggravating circumstances.
 A.
First, he contends that the trial court erred in refusing to find as a mitigating circumstance that he had no significant history of prior criminal activity. He contends that there was a conflict between his contention that this mitigating circumstance existed and the State's proposed aggravating circumstance that he had previously been convicted of a felony involving danger to a person. He also contends that he did not have an opportunity to object to the use of his prior conviction as an aggravating circumstance. Because he did not present these claims to the trial court, we review them for plain error. Rule 45A, Ala. R.App. P.
In regard to the mitigating circumstance that the appellant had no significant history of prior criminal activity, the trial court found as follows:
 "Does not apply. Defendant has been previously convicted of a felony involving the use of a deadly weapon, on or about October 17, 1994, in the State of Louisiana, which is significant, although the only such history."
(C.R.122.) With respect to the aggravating circumstance that the appellant had previously been convicted of a felony involving the use or threat of violence to the person, § 13A-5-49
(1), Ala.Code. 1975, the trial court found as follows:
 "Does exist, as evidenced by a certified copy of a conviction in Louisiana for the felony offense of `car-jacking,' where a weapon (.380 pistol) was used in the *Page 1039 
commission of the offense, thus constituting a threat of violence to the person (victim). "
(C.R.120.) Finally, the appellant admitted that he had been convicted of car-jacking in Louisiana and that a pistol had been used in the commission of the offense.
The appellant's claims that he did not receive notice concerning the aggravating circumstances are refuted by the record. After the appellant was found guilty of both capital murders and before the sentencing phase began, the State informed the trial court and the appellant that it intended to rely on two aggravating circumstances: 1) the appellant had previously been convicted of a crime involving the use or threat of violence to a person, § 13A-5-49
(2), Ala. Code 1975, and 2) the capital offenses were especially heinous, atrocious, or cruel compared to other capital offenses; § 13A-5-49 (8), Ala. Code 1975. At that time, the appellant did not object to the State's proposed use of his prior conviction as an aggravating circumstance. Moreover, we held in Bush v. State, 695 So.2d 70, 87
(Ala.Cr.App. 1995), aff'd, 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418,139 L.Ed.2d 320 (1997), that § 13A-5-49, Ala. Code 1975, puts a capital defendant on notice of the aggravating circumstances against which he might be required to defend As we stated inBush, "[t]his statutory notice satisfies constitutional requirements." Id. Thus, the appellant's claims are without merit.
In considering mitigating circumstances, the trial court complied with Lockett v. Ohio, 438 U.S. 586, 604,98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and its progeny. It allowed The appellant to present all of the mitigating evidence he wanted to present, and it fully considered that evidence in imposing the sentence, "`While Lockett and its progeny require consideration of all evidence submitted as mitigation, whether the evidence is actually found to be mitigating is in the discretion of the sentencing authority.'" Ex parte Slaton, 680 So.2d 909,924 (Ala. 1996), cert. denied, 519 U.S. 1079,117 S.Ct. 742, 136 L.Ed.2d 680 (1997) (quoting Bankhead v. State,585 So.2d 97, 108 (Ala.Cr.App. 1989)). See alsoCaroll v. State, 599 So.2d 1253 (Ala.Cr.App. 1992), aff'd, 627 So.2d 874 (Ala. 1993), cert. denied, 510 U.S. 1171,114 S.Ct. 1207, 127 L.Ed.2d 554 (1994); Ex parte Harrell,470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935,106 S.Ct. 269, 88 L.Ed.2d 276 (1985). Although the trial court must consider all mitigating circumstances, it has discreton in determining whether a particular mitigating circumstance is proven and the weight it is given. Caroll v. State, supra; Williams v.State, supra; Ex parte Harrell, 470 So.2d 1309
(Ala.), cert. denied, 474 U.S. 935,106 S.Ct. 269, 88 L.Ed.2d 276 (1985). Therefore, the trial court's refusal to find as a mitigating circumstance that the appellant did not have a significant history of prior criminal activity was proper.
 B.
Second, the appellant contends that the trial court erred in finding as an aggravating circumstance that the murder of Tressa Patterson was especially heinous, atrocious, or cruel compared to other capital offenses. The trial court did not actually make such a finding concerning the murder of Tressa Patterson. Further more, because the trial court sentenced the appellant to life imprisonment without the possibility of parole for the murder of Tressa Patterson, his argument with respect to her murder is moot.Jones v. State, 672 So.2d 1366, 1371 (Ala.Cr.App. 1995).
 C.
Third, the appellant contends that the trial court erred in finding that the murder of James Patterson was especially heinous, atrocious, or cruel compared to other capital offenses. He did not present this argument to the trial court. Therefore, we review it under the plain error rule. Rule 45A, Ala. R.App. P. *Page 1040 
 "In Ex parte Kyzer, 399 So.2d 330, 334 (Ala. 1981), this Court held that the standard applicable to the `especially heinous, atrocious, or cruel' aggravating circumstance under § 13A-5-49 (8) is that for a crime to fit within that section it must be one of "those conscienceless or pitiless homicides which are unnecessarily torturous to the victim.'
". . . .
 "This Court has decided upon an approach for the purposes of § 13A-5-49 (8). In comparing capital offenses for the purposes of determining whether a capital offense was `especially heinous, atrocious or cruel,' the court uses the Kyzer
standard. Capital offenses falling under § 13A-5-49
(8) are, pursuant to the Kyzer standard, those `conscienceless or pitiless homicides which are unnecessarily torturous to the victim.' Kyzer, 399 So.2d at 334."
Ex parte Bankhead, 585 So.2d 112, 124-25 (Ala. 1991), aff'd. on return to remand, 625 So.2d 1141 (Ala.Cr.App. 1992), rev'd on other grounds, 625 So.2d 1146 (Ala. 1993).
With regard to the murder of James Patterson, the trial court found as follows:
 "[A] 22-month-old child was left in a burning mobile home, the fire having been set by the defendant with the knowledge that the child was inside, helpless to defend or protect himself, or too immature to know the existence of any danger or threat to life, who either inhaled products of combustion causing death, or burned to death from the flames, to the extent that he resembled a dog, according to the testimony of one witness."
(C.R.121.) There was also evidence that James Patterson was alive and present in the room when the appellant shot his mother. In his statement to the fire marshal, the appellant stated that he picked James Patterson up and said, "Man, yo momma's dead." He then poured alcohol on Tressa Patterson's body and on the fireplace and started a fire. He left the mobile home, leaving James Patterson, who was still alive, inside to burn to death. The medical examiner, Dr. James Lauridson, testified that he found a great deal of soot in James Patterson's windpipe, indicating that he had breathed in smoke from the fire, and high levels of carbon monoxide in his blood. He determined that James Patterson died as a result of the fire and the inhalation of the smoke and other substances associated with the fire. Lauridson also testified that James Patterson was alive when the fire started and lived "for a minimum of minutes and possibly longer than that, possibly five or ten minutes in a fire such as this." (R. 390.) Finally, Lauridson indicated that "it is possible that the boy, James, could have experienced the heat, could have experienced the irritation of the inhalation of smoke, and could have experienced the fear of knowing that the house he was in — the trailer he was in was burning." (R. 402-03.) The record supports the trial court's finding that the murder of James Patterson was especially heinous, atrocious, or cruel when compared. to other capital cases. See Henderson v. State, 583 So.2d 276,304 (Ala.Cr.App. 1990), aff'd, 583 So.2d 305 (Ala. 1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268,117 L.Ed.2d 496 (1992); Ex parte Kyzer, 399 So.2d 330 (Ala. 1981). Accordingly, the appellant's argument is without merit.
 IV.
For the foregoing reasons, we affirm the appellant's conviction and sentence of life imprisonment without the possibility of parole for the murder of Tressa M. Patterson. We are required to address the propriety of the appellant's conviction and sentence of death for the murder of James Patterson. § 13A-5-53, Ala. Code 1975. The appellant was indicted for and was convicted of capital murder because the victim was less than 14 years of age. §13A-5-40 (a)(15), Ala. Code 1975. The trial court accepted- the jury's recommendation and sentenced the appellant to death for the murder of James Patterson. *Page 1041 
There is no indication in the record that the sentence of death was imposed as the result of the influence of passion, prejudice, or any other arbitrary factor. § 13A-5-53 (b)(1), Ala. Code 1975.
The trial court found that the aggravating circumstances outweighed the mitigating circumstances. The trial court found two aggravating factors: 1) the defendant had previously been convicted of a felony involving the use or threat of violence to the person-specifically, "a conviction in Louisiana for the felony offense of `car jacking,' where a weapon (.380 pistol) was used in the commission of the offense, thus constituting a threat of violence to the person (victim)," §13A-5-49 (2), Ala. Code 1975, and 2) the offense was especially heinous, atrocious, or cruel compared to other capital offenses, § 13A-5-49 (8), Ala. Code 1975. The trial court found as a statutory mitigating circumstance -that the defendant was 20 years old at the time of the crime, §13A-5-51 (7), Ala. Code 1975. The trial court indicated in its sentencing order that it considered the other evidence offered by the appellant in mitigation. In addressing nonstatutory mitigating circumstances, the trial court found as follows:
 "There was limited evidence or argument, of some degree of mental retardation, though not sufficient for a finding that the defendant committed his offense while under the influence of extreme mental or emotional disturbance or sufficient to substantially diminish or impair his appreciation for the wrongfulness of his actions or to conform his actions to the requirements of the law, The defendant was raised in a `broken home,' though some of his childhood years were spent in a Methodist Children's home, which may have benefited him to some degree. The defendant's return to the scene of the crime rather than `taking off' is found to be fairly insignificant as a mitigating factor."
(C.R.123-24.) The trial court weighed the aggravating circumstances and the mitigating circumstances, found that the aggravating circumstances outweighed the mitigating circumstances, and sentenced the appellant to death. The trial court's decision is supported by the record, and we agree with its findings.
Section 13A-5-53 (b)(2), Ala. Code 1975, requires us to weigh the aggravating and mitigating circumstances independently to determine the propriety of the appellant's sentence of death. After independently weighing the aggravating and mitigating circumstances, we conclude that the appellant's sentence of death by electrocution is appropriate.
As required by § 13A-5-53 (b)(3), Ala. Code 1975, we must determine whether the appellant's sentence was disproportionate or excessive when compared to the penalties imposed in similar cases. In Ex parte Woodard, 631 So.2d 1065
(Ala.Cr.App. 1993), cert. denied, 662 So.2d 929
(Ala.), cert. denied, 513 U.S. 869, 115 S.Ct. 190,130 L.Ed.2d 123 (1994), we held that § 13A-5-40 (a)(15), Ala. Code 1975, is not unconstitutionally overbroad, vague, or arbitrary. We also held that the statute sufficiently narrows the class of people who may become "death eligible," Id. at 1070. Based on our decision in Woodard, we hold that the appellant's sentence of death for the murder of James Patterson was neither disproportionate nor excessive.
Finally, with respect to the appellant's conviction for the murder of James Patterson, we have searched the entire record for any error that may have adversely affected the appellant's substantial rights. We have found no such error. Rule 45A, Ala. R.App. P.
Accordingly, we affirm the appellant's conviction and sentence of death by electrocution for the murder of James Patterson.
AFFIRMED.
LONG, P.J., and McMILLIAN, COBB, and BROWN, JJ., concur. *Page 1042